[Crim. No. 247. Third Appellate District.—September 2, 1914.]

THE PEOPLE, Respondent, v. F. H. HAIL, Appellant.

CRIMINAL LAW—HOMICIDE—SUFFICIENCY OF EVIDENCE TO SUSTAIN CON-VICTION.—In this prosecution for homicide, although the evidence is technically sufficient to uphold the conviction of manslaughter, there exists grave doubt of the guilt of the accused of any crime.

ID.—ARGUMENT OF DISTRICT ATTORNEY—WHEN IMPROPER AND GROUND FOR REVERSAL.—Where there is a manifest paucity of evidence tend-ing to establish the guilt of the accused, as is here the case, it is reversible error for the district attorney to state in his argument that the jurors, if they acquit the defendant, will be afraid to go upon the streets and meet their fellow-men.

ID.—DUTY OF DISTRICT ATTORNEY—MAJESTY OF LAW—KEEPING WITHIN RECORD.—A public prosecutor represents all the people, of whom every person accused of violating public law is none the less one because he is so accused. He represents the majesty of the law, which stands for the protection of every citizen against the taking of his life, his liberty, or his property without its due process—the law which condemns rather than commands the conviction of a per-son of a public offense upon insufficient evidence or by unfair means. That official should always do his sworn duty, of course, but he should always do it fairly and justly and not permit the great power with which he is clothed to be converted into an instrument of persecu-tion. He should, as indeed any lawyer should, in his address to a jury, remain strictly within the record, and not attempt to evolve any theory or to import into the case any features not fairly and reasonably justified by the proofs.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—REVIEW ON APPEAL.—Alleged misconduct of a district attorney may be reviewed on an appeal from the judgment, notwithstanding the absence of any ruling of the trial court in reference thereto, if objection is made by the defendant and the trial court refuses to take any heed thereof, and exception is reserved and presented by a proper record on appeal.

APPEAL from a judgment of the Superior Court of Plumas County and from an order refusing a new trial. J. O. Moncur, Judge.

The facts are stated in the opinion of the court.

L. N. Peter, Jas. M. Hanley, and W. W. Kellogg, for Appel-lant.

U. S. Webb, Attorney-General, and J. Charles Jones, Dep-uty Attorney-General, for Respondent.

THE COURT.—The defendant, having been convicted of
the crime of manslaughter under an information filed in the
superior court of Plumas County, charging him with the crime
of murder, alleged to have been committed at Quincy, in said
county, on the sixteenth day of August, 1913, prosecutes these
appeals from the judgment and the order denying him a new
trial.

The assignments of error are numerous and may be stated in
orderly sequence as follows: 1. That the evidence does not sup-
port the verdict; 2. That the court erred in certain rulings
whereby certain evidence was admitted and certain evidence
excluded; 3. That the district attorney, during the trial of
the cause and in his argument to the jury, was guilty of mis-
conduct seriously prejudicing the substantial rights of the
accused; 4. That, in its charge, the court misdirected the jury
in matters of law; and, 5. Newly discovered evidence, etc., etc.

In view of the conclusion we have reached that the judg-
ment must be set aside on the ground of substantial prejudice
suffered by the defendant by reason of certain remarks by the
district attorney in his argument to the jury, it will be un-
necessary to notice the other assignments. A consideration of
the point which we conceive demands a reversal of the judg-
ment and the order will, however, necessitate a somewhat
extended review of the evidence.

The voluminousness of the evidence adduced at the trial, and
which, in its entirety, constitutes a part of the record on these
appeals, may at once be apprehended when it is stated that
forty-five witnesses were called, gave testimony and most of
them subjected to exhaustive cross-examination. It would,
therefore, be impossible, in the examination of the evidence, to
consider and review in this opinion in full detail the testimony
of each of the witnesses. Indeed, since there appears to be,
upon the face of the testimony, little or no material conflict
therein, with perhaps an exception or two upon certain points,
to which it will be our duty to direct attention, it is deemed
necessary only to present here an accurate synoptical state-
ment of the facts which logically follow from the evidence,
now and then, as in our judgment the necessity of this decision
may require, briefly quoting certain testimony.

The defendant, at the time of the homicide, was sixty-two
years of age and a journalist by profession, having been, up
to the time of the unfortunate affair of which this case is the

outgrowth, continuously engaged, for a period exceeding thirty years, in the business of publishing and editing newspapers in Plumas County.

The deceased, John H. Boyle, was a lawyer by profession and was, and had been for several years prior and up to the time of his death, engaged in prosecuting the practice thereof at Quincy, the county seat of said county. He was, at the time mentioned, about thirty-five years of age, in stature measured five feet, nine inches and three-quarters and in robust health.

It appears that, approximately a year prior to the date of the homicide, the deceased had made an application to the Masonic lodge of Quincy to become a member thereof, and that, upon considering and voting upon said application, said lodge rejected it and thus denied the deceased the privilege of becoming affiliated therewith. The result of the action of said lodge upon his application was, quite naturally, a sore disappointment to Boyle, and it seems provoked in him an intense feeling of hostility and resentment against all the members of said lodge in general and in particular against the individual, whoever he might be, whose vote upon the application had resulted in its rejection. According to the undisputed evidence, he, on indiscriminate occasions, bitterly denounced the members of the lodge collectively, referring to them in language scurrilous and opprobrious in the extreme. He let it be understood in no uncertain language that he would in some manner avenge the wrong which he conceived had been committed against him by the denial to him of the privilege of entering into membership of the Masonic fraternity, if he could succeed in discovering the identity of the member of the local lodge of that order who had cast the "blackball" against his application. He appears to have started an investigation looking to the disclosure of the identity of the individual who thus had prevented his acceptance into the lodge and kept up a relentless prosecution of it until he had obtained information, sufficient to him, upon which to base the belief that the defendant was the party who had cast the vote fatal to his hope of becoming a member of the lodge. Whether he had any tangible ground upon which to found his belief or suspicion, or whether he had obtained satisfactory evidence that the defendant was the party who cast the "blackball" on his

application, it is very evident that he in good faith believed that the accused cast the vote which obstructed his admission into the lodge, for it appears that for a period of approximately nine months prior to his fatal meeting with the defendant, he repeatedly accused the latter of having been responsible for the rejection of his application and had repeatedly referred to him in the most abusive and violent language and threatened to get even, or, as some of the witnesses put it, declared that he would "get him." Shortly after he had been rejected as an applicant to membership of the lodge, the deceased met the defendant and at once entered upon a discussion of the fact of his rejection, asking the latter if he was present at the lodge meeting at which his (deceased's) petition was considered and acted upon. The defendant replied that he was at said meeting, whereupon the deceased denounced the man who "blackballed" him as a "son of a bitch," and added, in great anger and vehemence, "that he would continue to hunt the son of a bitch that blackballed him and when he found him he would get him." Later—about six weeks or two months previously to the date of the tragedy—the deceased again saw and met the defendant, this time in the corridor of the court house. Of this meeting the defendant testified: "Mr. Boyle came rapidly behind me and accosted me, leaning his elbow on the post or railing and looking straight at me, in a menacing manner, said: 'Mr. Hail, will you deny to me that you cast that blackball against me?'" To which Hail answered: "John, I will neither deny it nor affirm it, as I have already told you," and thereupon Hail hastily left the deceased and went up the stairs of the court house.

For some time prior to the day on which the fatal shooting occurred, Hail had at various times been told by different parties that the deceased had reached the conclusion that he (Hail) had cast the "blackball" against the former; that the deceased was constantly abusing the defendant in severe and scurrilous terms and that he had made threats against Hail.

We are now brought to the day of the homicide, some of the immediate circumstances of which will be the better understood by the following preliminary explanation: It appears that, during the course of the agitation over the rejection of the petition of the deceased to become a member of the Masonic lodge, an article, anonymously signed, was

published in the *News,* a newspaper published at Greenville, in Plumas County. It further appears that, subsequently to the publication of said article, a certain editorial was printed in the *National-Bulletin,* a newspaper published and edited by the defendant at Quincy. There is nothing in the record from which the character and the specific subject matter of said articles can definitely be ascertained or determined. It is, however, fairly and reasonably inferable from the whole record and the references in the testimony to said articles that the one printed in the *News* contained an acrimonious discussion of the action of the Masonic lodge in rejecting the petition of the deceased, and, perhaps, an insinuation that the defendant was responsible for said action, and a severe arraignment of him therefor, and that the article published in the *National-Bulletin* was a reply thereto and while not referring by name to the author of the article appearing in the *News* (doubtless for the reason that his identity was not certainly known to the defendant), severely (it is to be apprehended) anathematized the latter and his article. At all events, it is clearly manifest from the testimony that the *News* article was exceedingly offensive to the defendant and that the latter's article greatly offended and was resented by the deceased, he having been persuaded, at least in some measure, that the strictures contained in said last mentioned article, whatever they might have been, were aimed at him. With this explanation, we will return to the day of the tragedy.

Between half-past 7 and 8 o'clock of the evening of August 16, 1913, the defendant and one Edward Huskinson were holding a conversation near the outer edge of the sidewalk, in front of what is known as the "Capitol Saloon," located on Main Street, in Quincy, the defendant, it appears, standing on the ground or not quite upon the sidewalk, but near the curbing. They had thus been engaged for a very brief period of time ("probably a minute, maybe two," so Huskinson thought), when the deceased put in an appearance and approaching the spot where the two men were standing, and with "a little wild, a little glitter in his eye, *under subdued excitement,*" addressed the defendant, saying: "Mr. Hail, I would like to see you a minute." Hail, thereupon, and without making a reply to the deceased, im-

mediately "turned around and hastily stepped up on the sidewalk and started up town past the barber shop. Mr. Boyle turned and followed, headed him off in front of the barber shop." Huskinson testified that, at that juncture, he "started across the sidewalk towards the Capitol (saloon). Just as I got to the swinging doors," he continued, "I thought I heard something like a slap and immediately followed by the words: 'You son of a bitch.' I turned around and saw Mr. Boyle backing down the sidewalk and Mr. Hail following him. Mr. Hail had an open pocket knife in his hand and as Mr. Boyle backed off the sidewalk, I jumped in between them. I said: 'For Christ's sake, Johnny, cut this out,' or, 'let's have none of this.' At that I looked at his hand and found there was nothing in that, but his hands were clasped, clinched; then I turned around and Mr. Hail was gone. I asked Mr. Boyle: 'What has become of Hail?' He says: 'He has gone after his gun—by G—d, I will be here when he comes back.'" Huskinson and Boyle, after the departure of Hail, stepped up on the sidewalk, and Huskinson asked Boyle what he had done. The latter replied that he had asked Hail "if he meant that article" for him, that Hail returned an affirmative answer and that he (Boyle) thereupon slapped Hail's face.

Hail's version of the first meeting between the deceased and himself is as follows: That he was on his way to the Masonic hall carrying with him a written invitation from the board of education to the Masonic lodge to conduct the ceremonies of laying the corner-stone of a new high school building in Quincy, the construction of which was then in progress; that he met Huskinson at the point above mentioned and paused to tell him of said invitation and, while so engaged, "Boyle came up and took a position on the sidewalk between Huskinson and myself. With a jerk of the head and a fierce, menacing expression on his face, said: 'Mr. Hail, I would like to speak to you a minute as soon as you are through with Mr. Huskinson.' I made no reply and started to go down the street past the Grand Central Hotel and post-office to the Masonic building. Mr. Boyle followed me, and, as I was about to step up on the sidewalk, he accosted me again and said: 'Parties tell me that article in the paper meant me.' I made no reply other than to say: 'That is up to you, John.' As quick as I got the words, 'that is

up to you, John' out of my mouth, he struck me a heavy blow on the left side of my head and ear with his right hand, accompanying the blow with the words, 'you son of a bitch.' He also called me a black bastard. · I jumped up on the sidewalk, told him he was a dirty coward, and moved westward past a post and a tree or trees; I knew he was a young man, thirty-five years of age, active and powerful, and that I was an old man of sixty-two years and in a weakened condition. I, therefore, knew that I had no show with him in a physical contest. As I passed westward of the post and tree or trees, I quickly took from my pocket a small pen knife and opened it. I did this, not for the purpose of assaulting Mr. Boyle, but for the purpose of warding off and preventing him from making an attack upon my life, as he had previously threatened. . . . During the latter part of his trouble Mr. Huskinson was on the sidewalk at my right, by words and acts trying to stop the trouble. Mr. Huskinson's efforts gave me an opportunity to escape from a disgraceful street brawl, and possibly prevented another assault upon my life, and I did so.''

After the departure of Hail from the scene of the assault above described, Huskinson remained for a while with Boyle and undertook to persuade him to drop the matter and to leave that part of the street. Huskinson's expostulations were unavailing, and, saying to the deceased, ''Well, Johnny, if you aint going, I am—for Heaven's sakes don't have any trouble,'' he walked into the Capitol saloon.

With the exception of a child just past the age of eight years, Albert Vance by name, who said that he saw Boyle slap Hail a severe blow and the latter with a knife in his hand attempting to stab the former, although the two men, he said, were never close to each other after Boyle struck Hail, the only witnesses to the first altercation between the defendant and the deceased were Huskinson, Boyle, and Hail. There was no material variance between the testimony of Huskinson and that of Hail relating to the circumstances of the original actual hostile meeting of the parties, and it is hence manifest that the testimony of these witnesses detailing said circumstances stands in the record undisputed. Thus the proposition is obvious that the deceased was the original aggressor or the first to precipitate actual hostilities.

It now remains to be seen what the evidence discloses relative to the subsequent events which finally led to the fatal shooting.

As seen, the defendant left the scene of the first difficulty immediately after Huskinson stepped in and stopped the further progress of the altercation. The testimony shows and, in fact, the defendant declared it to be true on the witness stand, that, forthwith upon the cessation of the first trouble, he started for and went to his office. What he did there and of his movements thereafter up to and including the time of the shooting may best be told in his own language, inasmuch as his is the only testimony disclosed by the record bearing upon certain incidents occurring after the original difficulty and immediately connected with the final chapter of the tragedy. He testified: "I entered the office and went back to the editorial room, turning on the electric light with my hand and handkerchief and examined my head and ear to see if they were bloody. I found no blood. I then reached down into a drawer of my desk and took therefrom a pistol and put it in my right front pants pocket, for the purpose of defending myself against an assault by him should he make it again that evening in accordance with threats previously made. I left my office and resumed my journey to the Masonic lodge. I was going to the Masonic lodge for the specific purpose already referred to—that of delivering the resolution adopted by the board of education to the secretary of the lodge. Near the west line of Mr. Stone's jewelry store I observed Mrs. B. Schneider coming across the street from the Plumas House. She hailed me she said to have a talk with me. I told her I was in a hurry at that time and could not do so, but that I would be glad to do so on a future occasion. She signified her assent and I resumed my journey to the Masonic lodge. The Masonic lodge, while I think the rule is 7:30, in the summer months, it seldom meets before 8 o'clock, usually about that time. I was hurrying to get there before lodge opened and deliver this document to the secretary. Q. What course did you pursue along the street after talking to Mrs. Barney Schneider? A. I went along the sidewalk on the north side of Main Street. Q. What is your usual course and what had been your accustomed course in going to the Masonic lodge? A. To go down by the way of the *National-Bulletin* office and Main Street." (This

course would require the defendant to pass the point where the deceased made his first assault upon Hail.) "Q. After leaving Mrs. Schneider, going along Main Street, did you know whether or not John Boyle, the deceased, would be upon the street that night? A. I didn't know positively that he would be on the street, yet I was afraid that he might be." The defendant continued: "I did not expect to meet him for the reasons I have indicated, but of course I did not know but I might meet him, especially as to reach the Masonic lodge I was compelled to go near his residence which is next door. When I reached a point near the east line of the Ford and Lee Company's grocery store, I glanced ahead of me and saw Mr. Boyle partially crouched and hidden behind a post near the scene of the former trouble. Mr. Boyle had his right leg thrown back and his right hand at his hip pocket. I changed my course of travel from the center of the sidewalk to one near the walls of the building on the opposite side of the sidewalk from where Mr. Boyle stood. When I got to a point probably a couple of feet west of him he suddenly sprang from his position behind the post on to me and with some epithet struck me a heavy blow on the left side of the head with his fist. The effect of the blow was to daze me. When I found myself recovering from the condition mentioned I found Mr. Boyle clinching with me and myself endeavoring to draw my pistol. It was at that time that I heard two shots fired in rapid succession. At least it so seemed to me. I was confident Mr. Boyle had fired for the purpose of taking my life, as threatened. The second shot entered my left leg, badly shattering it. . . . I sank back to the sidewalk. I thought Mr. Boyle had fired the shots. During the time that I was sinking on the sidewalk, and immediately after, I fired three shots. When I first saw him (Boyle) when I sank he was over me on his hands and knees on all-fours. After the third shot that I fired while sinking to the sidewalk, or immediately after reaching it, was fired, Mr. Boyle, whom I saw as before stated just above me, turned over, his left hand, so to speak, seemingly using it as a pivot, turned over to my left and to the east on the sidewalk on his back. As soon as the shooting ceased a crowd gathered and among them I observed Constable Mosely, County Surveyor Barbee, my son, Herbert F. Hail, Dr. Walsh and Dr. Bolton. . . . I said to my son, Herbert, 'I hope he wasn't

badly hurt.' I also said to him, 'He,' meaning Mr. Boyle, 'had struck me on the head and broken my leg.' "

No witness, other than the defendant himself, was produced who knew or pretended to know just how the second encounter was started, or who started it. Unless, therefore, there are in the case physical facts which clearly run counter to his story of how and by whom the second and fatal difficulty was begun, the defendant's testimony upon the following points appears in the record undisputed: 1. That, when the defendant retraced his steps from his office to the point where the original difficulty and the shooting transpired, he was on his way to the Masonic lodge; 2. That, although he thought it might be probable that he would again meet the deceased that night, he did not know, as he was on his way to the lodge, that Boyle was still at the scene of the first trouble; 3. That, as he approached the point where the first assault was made, and when within a few feet thereof, he saw Boyle in a crouching position behind a tree, with his right leg thrown back and his right hand upon his hip pocket; 4. That, upon seeing Boyle in that position, the defendant changed his course on the sidewalk, leaving the center thereof· and moving to the walls of the building, or on the opposite side of the sidewalk from where Boyle was standing, and thus attempted to pass the deceased; 5. That, when the defendant was about two feet west of and from the deceased and in the act of passing him, the latter suddenly sprang out and upon Hail and struck him a severe blow with his hand on the left side of the head, which blow caused the defendant to become dazed; 6. That, in the scuffle, Hail was wounded severely in the left leg above the ankle by a shot discharged from his own weapon.

There is, however, an apparent conflict in the evidence, so far as circumstances are concerned, upon the question whether Boyle was shot by Hail before or after the latter fell back upon the sidewalk.

The theory of the prosecution at the trial was, as is their position here, that Hail, having gone to his office for the express purpose of arming himself, returned to the scene of the original altercation with the hope of again meeting Boyle and with the intention of avenging the assault made by the latter upon him; that the two men met, that Hail drew his revolver and shot Boyle before any act of violence by Boyle,

and that the latter then attempted to wrest the weapon from Hail's possession; that, in the struggle that followed, Hail fired the shots that inflicted the mortal wounds in the body of Boyle and accidentally wounded himself in the leg.

There is, as already suggested, some testimony, very slight, however, which bears the appearance of supporting that theory. That two shots were discharged and that, after an interval of approximately a second, three more were fired in rapid succession, appears to be well established. Some of the witnesses for the prosecution seem to have been quite positive that all of the five shots were discharged while the two men were yet upon their feet and engaged in a struggle. The witness, Brown, for the people, testified that he heard two shots, turned around to see where they came from and that he saw Boyle "make a grab for a gun." He said further that, prior to seeing Boyle "grab for the gun," the latter did not have hold of Hail. Dr. Stewart testified that, just before the shooting, he saw Hail walking faster than his usual gait from the direction of his office to the point where the shooting occurred; that within a short interval of time thereafter he heard two shots, looked in the direction of the place where the firing took place, and that he saw a struggle going on between two men. He said that, immediately prior to the shooting, he saw no altercation or struggle in progress between the parties.

It will be observed that neither Brown nor Stewart says or makes any pretense of knowing what was going on between the two men just before they heard the first two shots—that is, they did not know and did not say whether a struggle between the two men preceded the firing of those shots. It is, however, clear, from the testimony of said witnesses, and, for that matter, from that of all the witnesses introduced by both sides that saw any part of the combat, that the deceased, if wounded by one of the first two shots, did not then receive a mortal wound. Dr. Walsh, the autopical surgeon, testified that he found three distinct wounds in the body of the deceased, two of which were necessarily fatal and from the effect of either of which death would almost instantaneously follow. The first of these wounds described by him, besides producing damage to other parts of the upper body, lacerated and destroyed the subclavian vessels—both the vein and the artery. The doctor explained that "the subclavian artery

and vein are feeders from the aorta and just pass directly over under the collar bone and go to form the blood supply to the upper extremity. . They are large vessels and a fatal hemorrhage would take place from either—from their injury—in a very few seconds." He said that a person thus wounded would likely die within fifteen seconds after receiving the wound "and would probably be unconscious in half that time." He said, in other words, that after the destruction of the subclavian blood vessels the person so injured would not be able to make a conscious movement—any movement of the body after that would be spasmodic. The second wound, in the order in which the doctor described them, while serious, was not necessarily fatal. The third "entered in the center of the breast bone, there passed a little downward and to the left and came out right at the edge of the shoulder blade on the left side of the back and then passed through the heart. In the last mentioned wound there was no hemorrhage, the heart being bloodless, from which circumstance the doctor concluded and expressed the opinion that death was caused by the wound first above referred to.

From the doctor's testimony these facts necessarily follow: 1. That the death of Boyle. was practically instantaneous with the infliction of the wound which destroyed the· subclavian vessels; 2. That the shot which penetrated the heart was received after life was extinct, for it is an obvious proposition that, if the deceased had still been alive when he received the shot in the heart, there would have been evidence of more or less hemorrhage in that wound; 3. That the struggle between the two men, whether they were upon their feet or down on the sidewalk, must have immediately ceased when Boyle received the wound whose effect was to destroy the subclavian artery and vein.

The next inquiry which may well be made is: Were the defendant and the deceased down on the sidewalk when the mortal wound was inflicted?

There were, it is conceded, but five shots discharged from Hail's weapon and that of these one entered the leg of Hail, three the body of Boyle and one "went wild," or, in other words, struck neither Boyle nor Hail. That the bullet which entered Hail's leg was discharged from the pistol while it was yet in the pocket of his trousers, seems to have been satisfactorily confirmed by the fact that said pocket was shown

25 Cal. App.—23

to have a hole in it, not unlike one which might have been produced by a bullet fired through the pocket, and evidently not caused by wear, since the pantaloons were comparatively new and worn by Hail on only a few occasions before the tragedy. And, inasmuch as it appears that the effect of the wound suffered by the defendant was so to shatter the bones of his limb below the ankle as to render it impossible for him to stand upon it, he must have immediately, on receiving said wound, sunk back upon the sidewalk, and from this it would seem that he was struck by the second shot and that two shots were discharged while the weapon was still in his pocket.

The theory following from the foregoing view of the testimony is that two shots were discharged in the pocket of Hail's pantaloons before he was able to draw the weapon therefrom and that the three shots which entered the body of Boyle were discharged while the two men were in a struggle down on the sidewalk. Moreover, this theory is supported by the testimony of a number of the witnesses for the defense, they having asserverated that, after the first two shots were fired, they saw Hail and Boyle fall to the sidewalk, the latter falling on top of the former, and that, after they had thus fallen, three shots were fired in quick succession, with the result that Boyle fell off of Hail and on his back on the sidewalk.

Thus it appears that the physical facts themselves coincide with and support the story of the tragedy as told by the defendant. In other words, the physical facts are not inconsistent with or contradictory to the testimony of Hail, either as to how and by whom the second trouble was started or as to how the shooting occurred. On the contrary, as stated, they seem to bear out and support his testimony as to how and at what point of time the shots were fired, while, as seen, there is absolutely no testimony contradicting his statement that Boyle started the second trouble in the manner described by him. And he was not impeached.

Under the circumstances as disclosed, no one will dispute the right of Hail, after the first assault, to have armed and thus have prepared himself to defend his person against what he had reasonable grounds for believing might be another violent and perhaps a more serious assault upon his person at the hands of his implacable enemy, between whom and himself a mere fistic contest would have been unequal or one-sided and

favorable to the deceased, because of the superiority of the latter in physical vigor and agility over the defendant, who was aged and still suffered, so he testified, from the effects of an injury to his head sustained by a fall some years before. No one will dispute the legal right of Hail to go out upon the public streets and his right to have returned by the route leading past the scene of the original difficulty to go to the Masonic lodge, of which he was a member, and to which he had been charged to carry a special message that evening, it being the regular meeting night of the lodge. It will be conceded that the story of the defendant of the second and fatal meeting, if true, disclosed a clear case of self-defense.

With the law and the only testimony showing or tending to show how and by whom the trouble between the parties at the second and fatal meeting was started thus stated, the question arises: Did the jury arbitrarily reject the defendant's testimony, or, examining it under the tests whereby the credit of human testimony must and can only be determined, did they question its verity and so exclude it as a factor or element determinative of the question of guilt or innocence?

It will be admitted that, with the exception of the fact of the homicide itself and the circumstance that the defendant resumed his way to the Masonic lodge over a course leading past the scene of the first assault, there is absolutely no affirmative testimony in the record tending to establish the crime of murder. And, if the jury rejected the testimony of the defendant, then, manifestly, there was left in the record no testimony disclosing the circumstances of the beginning of the second difficulty and, therefore, obviously, none to show that the homicide was the result of a sudden quarrel or heat of passion, the elements of voluntary manslaughter, of which the defendant was convicted.

Thus we have examined, analyzed, and considered the testimony, not because we feel justified in declaring that the evidence does not, as a matter of law, support the verdict, but to demonstrate that, while the evidence may be said to be technically, and only technically, sufficient to uphold the jury's conclusion, there appears to exist a doubt of the gravest character of the guilt of the accused of any crime, and thus to illustrate the seriousness of the point, vigorously urged against the validity of the verdict, involving the charge that the district attorney, in his argument to the jury unwarrantably used

language whereby the defendant was deprived of a fair and impartial trial.

Thus we are brought to the consideration of the point just mentioned.

Preliminarily, it is objected by the attorney-general that the point involving the asserted misconduct of the district attorney cannot be reviewed either on an appeal from the judgment or the appeal from the order denying a new trial, except where it is made to appear that by some ruling respecting the alleged misconduct the court has made an error which could be made the ground of a motion for a new trial. As sustaining this position the attorney-general cites the cases of the *People* v. *Amer,* 151 Cal. 303, [90 Pac. 698], and *People* v. *Amer,* 8 Cal. App. 137, [96 Pac. 401].

In the first mentioned case it is said: "In view of the fact that the misconduct of the district attorney has so often been held to constitute a sufficient ground for reversal of the judgment, it may be that it has become a settled rule that the question of the misconduct of the district attorney will be considered upon an appeal from the judgment when presented by a proper record and the points saved for review by exception."

In the second case referred to it is said that "there is no authority whatever in the statute for holding that such misconduct of the district attorney, aside from any ruling of the court in reference thereto, can be properly reviewed on appeal from the judgment unless it is a ground for a motion for a new trial." It is further said in that case that "if any other rule has been established, it must be by virtue of judicial legislation." In this case, however, the court refused to take any heed of the objection of the attorney for the defendant to the remarks of the district attorney constituting the alleged misconduct of that officer in his address to the jury, and in this we think the court committed an error which could properly be made the basis of a motion for a new trial. We are of the opinion, therefore, that the question of the misconduct of the district attorney, exception to such misconduct having been reserved and presented here by a proper record, may be reviewed on the appeal from the judgment. (See *People* v. *Pang Sui Lin,* 15 Cal. App. 263, [114 Pac. 582].)

In the course of his argument to the jury, the district attorney said: "Men have been acquitted who have committed cold-

blooded murder, and if you were to acquit this man under the
testimony here you would be allowing a cold-blooded murderer
with human gore yet dripping upon his hands to go unwhipt
of justice; gentlemen, you cannot do it, you will not do it.
*Should you do it you would be afraid to go out on the street
and meet your fellow-men.*"

Counsel for the defendant, immediately upon the utterance
of said language, assigned it as error and moved the court to
instruct the jury to disregard it. As before stated, the court
in effect refused, or, at any rate, omitted to do so, saying:
"I don't understand it; to me it doesn't mean anything;
proceed."

That the effect of the statement that the jurors, in the event
that they acquitted the defendant, would be afraid to go out
upon the public streets and meet their fellow-men, was to in-
timidate or influence them to return a verdict of conviction,
regardless of their views as to the effect of the evidence, cannot
for a moment be doubted. Whether the language referred to
was used in good faith or for the purpose of influencing a
verdict, is immaterial. The vice and damaging effect of the
utterance upon the rights of the accused remained. In a case
where evidence of guilt was overwhelming or conclusive, we
might justly say that the language was not prejudicial in its
effect upon the legal rights of the defendant, although the use
of such language would in such case be none the less repre-
hensible. But this is, as we have shown, not such a case.

Both the defendant and the deceased were professional men
—the one a journalist, actively engaged in following his pro-
fession, the other a lawyer, actively prosecuting the practice
of his profession. They were, therefore, prominent and con-
spicuous characters in the county of Plumas and in its civic
and social affairs. Both had resided in that county for many
years and, we have the right to assume, were respected citi-
zens thereof. In the very nature of things, therefore, the
tragedy must have aroused great excitement among the people
of said county and have provoked a high state of public feel-
ing. Doubtless, as is invariably so in such cases, where the
actors are prominent and well known, the people of the com-
munity took sides and were pronounced in their partisanship
on the one side or the other. This condition of the public
mind we cannot and do not take judicial notice of, but from
common experience we know that it will arise and exist on

occasions such as the one responsible for this case in a comparatively small community, in point of population, where everybody has more or less personal acquaintance with everybody else. Hence, in such a case, where, as here, there is a manifest paucity of evidence tending to establish the guilt of the defendant, language such as the district attorney used in this case in his address to the jury must have had and should be held to have had the effect of denying to the accused that fair and impartial trial before a jury of his fellow-men guaranteed by the law to every person put upon his trial for his life or his liberty.

The language complained of amounts, substantially, to a direct declaration to the jury that, if they did not convict the defendant, they would lose the respect and confidence of their friends and neighbors. Thus the question of the honesty and the integrity of the jury was injected into the case. In other words, the jurors themselves were put upon trial by the district attorney, and whether they could bravely meet their fellow-citizens and face them with clear consciences was made by that official to depend upon whether they found the defendant guilty.

A public prosecutor represents all the people, of whom every person accused of violating public law is none the less one because he is so accused. He represents the majesty of the law, which stands for the protection of every citizen against the taking of his life, his liberty or his property without its due process—the law which condemns rather than commands the conviction of a person of a public offense upon insufficient evidence or by unfair means. That official should always do his sworn duty, of course, but he should always do it fairly and justly and not permit the great power with which he is clothed to be converted into an instrument of persecution. He should, as indeed any lawyer should, in his address to a jury, remain strictly within the record and not attempt to evolve any theory or to import into the case any features not fairly and reasonably justified by the proofs.

In this case the district attorney's address to the jury fairly reeked with violent abuse of the defendant and other declarations not warranted by the evidence or fairly within the bounds of the record or any theory reasonably deducible therefrom. He repeatedly characterized the defendant as a cold-blooded murderer and often misstated the law of the case. He

accused the defendant of having caused the hole to be made
in his pantaloons pocket, where he carried his pistol, after
the homicide occurred, when, as a matter of fact, there was
not a scintilla of evidence to warrant the accusation. He
made insinuations as to the contents and character of the
article published in the defendant's newspaper, after the court
had excluded it from the record. No exceptions were re-
served by the defense to any of the declarations thus adverted
to, but we here refer to them merely as indicating the general
manifestly unfair attitude of the district attorney toward the
accused and as disclosing a determination on his part to secure
a conviction. Whether, as before suggested, that officer was
actuated in his argument by a firm conviction of the guilt of
the defendant or was thus carried away from the record by
permitting his zeal to usurp the place of his better judgment,
as is too often true with public prosecutors, we cannot say,
nor is it necessary to inquire, since the palpable effect of his
language upon the jury—the language to which exception was
reserved—is the end of the inquiry here.

The cases are replete with severe arraignments of prosecut-
ing officers for unfairness in the presentation of cases against
persons accused of crime, and there have been very justly re-
corded many reversals for misconduct no more obnoxious than
that complained of in the case at bar. The number of such
cases is so large that it would greatly extend the length of this
opinion— now more extended than had been desired—to at-
tempt to notice all of them. We shall examine a few of them,
however.

In the case of the *People* v. *Bowers,* 79 Cal. 415, [21 Pac.
752], the language used in animadverting upon the conduct
of the district attorney for referring in his argument to the
jury to matters *de hors* the record, has peculiar application to
the present case. The court, after an examination of the evi-
dence, said: "We do not feel like saying, under these circum-
stances, that as a matter of law the jury could not be satisfied
beyond a reasonable doubt of the guilt of the defendant, but
it is evident that the case was one of great difficulty, and re-
quired unusual circumspection, and the utmost coolness and
impartiality in its consideration. . . . In view of all these
circumstances, certain occurrences at the trial have a signifi-
cance which in a different kind of a case we should hesitate to
attribute to them. Unfortunately, the judge allowed himself

rather frequently to question the witnesses, always in the interest of the prosecution, and often by putting questions which were leading and suggestive. We think the jury would be sure to get the impression that the judge thought the defendant guilty. Still more objectionable was the conduct of the prosecuting attorney. It is true, the court properly interfered, rebuking the attorney, and instructing the jury to pay no attention to the statements. But the statements were well calculated to influence the jury in a case of this character, and it is impossible for us to say that no injury resulted to the defendant therefrom."

In *People* v. *Ah Lean,* 92 Cal. 282, [27 Am. St. Rep. 103, 28 Pac. 286], the supreme court, in reversing the judgment upon the ground that the prosecuting attorney in his address to the jury imported into the case matters which were not brought there by proof, said: "It follows that the only safe and just rule to follow in such cases is to make it impossible for a party to obtain any advantage from such misconduct of counsel by promptly granting a new trial to the adverse party." The court in that case also approvingly quotes the following language, most pertinent and forceful in its application to this case, from the case of *Tucker* v. *Henniker,* 41 N. H. 319: "When counsel are permitted to state facts in argument, and to comment upon them, the usage of courts regulating trials is departed from, the laws of evidence violated, and the full benefit of trial by jury is denied. It may be said, in answer to these views, that the statements of counsel are not evidence, that the court is bound to so instruct the jury, and that they are sworn to render their verdict only according to evidence. All this is true; yet the necessary effect is to bring the statements of counsel to bear upon the verdict with more or less force, according to circumstances; and if they, in the slightest degree, influence the finding, the law is violated, and the purity and impartiality of the trial tarnished and weakened. If not evidence, then manifestly the jury have nothing to do with them. It is unreasonable to believe the jury will entirely disregard them; they may think they have done so, and still be led involuntarily to shape their verdict under their influence."

In the case of the *People* v. *Mull,* 167 N. Y. 247, [60 N. E. 629], the New York court of appeals not only reversed the cause because of unwarranted statements by the district attor-

ney in his address to the jury, but severely animadverted
upon what seems to be a growing practice with prosecuting
attorneys to travel beyond the records of criminal cases in
their arguments to secure convictions. In that case, the dis-
trict attorney, in his argument, among other equally repre-
hensible statements, said: ''And if there is a man that sits in
those chairs that is willing to brand himself with suspicion
by saying Archie Mull did not commit this crime, my judg-
ment of his character is not correct. . . . Don't let it be said
of you from all the integrity and virtue and respectability of
this great county, twelve men cannot be gotten together who
will do justice. A failure to convict in this case, where there
is no defense and where there is no doubt, cannot fail to create
again another epidemic of murder in this county. It cannot
fail to bring within our borders hordes of desperadoes and
criminals, who rely upon the puerile inefficiency and weakness
of jurors here, and will select this as a safe field in which to
operate. The consequences of your failure to convict in this
case, in my judgment, cannot be weighed or gauged or meas-
ured at all. How could a more brutal, wanton and pathetic
tragedy be committed than this ? . . . It seems to me to have
been the purpose of the Almighty, in His stern and inscruti-
ble justice, to have saved the life of this boy, to tell you who
perpetrated this fiendish and unholy deed. But for the
miraculous and almost divine rescue of this eye-witness from
the very jaws of death, there might be a failure of justice;
but a failure by you now to convict and punish the murderer
would seem to me to be a mimicry and mockery against God.''
The court, addressing itself to those statements by the district
attorney, made, *inter alia,* the following pointed observations:
''The trial jury aims to secure popular justice. The rules
respecting the admission of evidence suffice to protect the
defendant from prejudice by irrelevant and hearsay testi-
mony, and declarations unsupported by evidence. It is the
right of the people, no less than of the accused, to address the
jury upon every matter legitimately bearing upon the case.
The general rule is that each party must keep within the evi-
dence. But the evidence may be examined, collated, sifted,
and treated in his own way. Whatever of argument, sugges-
tion, or inference can be constructed or deduced from it in
support of guilt, upon the one hand, or of inconsistency, con-
fusion, doubt, and uncertainty in support of innocence, upon

the other, is permissible, and may be presented with ingenuity, persuasion, vehemence, fervor and effectiveness. . . . But it is nevertheless true that the verdict should be impartial and be pronounced upon the evidence and according to the evidence. It follows that the address of counsel must be upon the evidence and according to the evidence. It is greatly to be feared that the remarks of the district attorney, in view of the former disagreement of the jury, and the positive though unproven assertions of the districct attorney during the episode upon bribery, intimidated the jury. Why should a failure to convict excite widespread indignation? And upon whom should it fall? What juror was willing to be thought so callous to public opinion, the respect of his fellow-citizens, reckless of his oath, heedless of the welfare of his family, willing to brand himself with suspicion, unwilling to do justice, and willing to acquit a murderer, whose guilt had been made clear by the testimony of an eye-witness, seemingly saved from death by a miraculous and almost divine rescue, according to the purpose of the Almighty, in order to prevent a failure of justice? Clearly, we ought not to allow a verdict to stand to the securing of which such methods and influences were thought by the public prosecutor to be necessary. If it be said that in the case before us there is no reasonable doubt of the defendant's guilt, it should be remembered that it is not for the courts, but for the jury, to say this by their free and impartial verdict; and we cannot know that they have said it, when we do know that they were told by the district attorney, and his statement was enforced by previous declarations of attempted bribery and his precautions against their success, that their own good repute was in jeopardy and could only be saved by convicting the defendant.''

Thus we have presented excerpts from a few of the cases upon the proposition under review, not for the reason that it is not clear in principle that reversals should be ordered where public prosecutors resort to the practice of bringing into their cases under the guise of argument or otherwise matters wholly outside the records and which are obviously calculated to influence juries, either consciously or unconsciously, in arriving at verdicts of guilty, contrary to the evidence and the law, but to show how such practice is uniformly condemned in strong language by the higher courts.

There are innumerable other cases in which similar views are expressed and like conclusions reached, and the practice referred to severely and justly condemned. It is not necessary here to review those cases, but among them the following will be found to be cogently applicable to the case at bar and instructive upon the question in hand: *People* v. *Fielding,* 158 N. Y. 542, [70 Am. St. Rep. 495, 46 L. R. A. 641, 53 N. E. 497] ; *People* v. *Butler,* 8 Cal. 435; *Vickers* v. *United States,* 1 Okl. Cr. 452, [98 Pac. 467, 473] ; *State* v. *Kauffmann,* 22 S. D. 433, [118 N. W. 337] ; *State* v. *Underwood,* 77 N. C. 502; *State* v. *Bobbst,* 131 Mo. 328, [32 S. W. 1149] ; *People* v. *Devine,* 95 Cal. 231, [30 Pac. 378] ; *People* v. *Ho Kim You,* 24 Cal. App. 451, [141 Pac. 950] ; *People* v. *Fleming,* 166 Cal. 357, [133 Pac. 291] ; *People* v. *Tufts,* 167 Cal. 266, [139 Pac. 78].

Our conclusion is that, with the defendant's guilt very doubtful under the evidence, the remarks of the district attorney above quoted were most damaging to the legal rights of the accused, that thereby he was deprived of a fair and impartial trial, and that the result reached by the jury, if permitted to stand under the circumstances, would involve a miscarriage of justice.

The judgment and order are reversed and the cause remanded.