[Crim. No. 21980. Second Dist., Div. One. Nov. 13, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
HERSCHEL ANDREW GAY, Defendant and Appellant.

664

**COUNSEL**

Long & Levit and Ronald E. Mallen for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, William R. Pounders and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

# OPINION

**FEINERMAN, J.**[*]—Defendant Herschel Andrew Gay was charged in a three-count information with the murders (Pen. Code, § 187) of Russell Volpi (count I) and Eve Hindin (count III) and with assault with intent to commit murder (Pen. Code, § 217) upon John Coulter Dilday (count II). Defendant pleaded not guilty and not guilty by reason of insanity to the charged offenses. A jury found the defendant guilty of murder in the first degree on counts I and III and also found him guilty of assault with intent to commit murder as charged in count II. The defendant then withdrew his plea of not guilty by reason of insanity as to all counts and the jury fixed the penalty at death for counts I and III.

Defendant's motions for a new trial and reduction of the death sentences to life imprisonment were denied and the court ordered imposition of the death sentences on counts I and III and sentenced the defendant to state prison on count II for the term prescribed by law. The court further found that the defendant was armed with a deadly weapon at the time of commission of the offense within the meaning of Penal Code sections 969c and 3024.

The defendant concedes the fact that the evidence during the trial was "overwhelming" that he committed the acts for which he was charged. His defense was not predicated upon a denial of the alleged acts, but rather upon diminished capacity. The thrust of the defendant's contentions at this time is that certain alleged errors on the part of the court and alleged misconduct on the part of the prosecutor in argument precluded the jury from fairly and correctly weighing the conflicting evidence on diminished capacity.

Defendant contends that (1) the judgment should be modified to provide punishment of life imprisonment; (2) it was prejudicial error to admit evidence of an uncharged offense; (3) the court abused its discretion in permitting Sergeant Janiszewski and the court-appointed psychiatrists to testify on rebuttal; (4) the court failed to advise defendant of his right against self-incrimination upon withdrawal of his plea of not guilty by reason of insanity; and (5) the prosecutor committed prejudicial misconduct in argument.

*People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (see also *Furman* v. *Georgia,* 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]) holds that the death penalty violates the California constitutional

---

[*]Assigned by the Chairman of the Judicial Council.

provision against cruel or unusual punishment (Cal. Const., art. I, § 6). The judgment should be modified to provide for life imprisonment on counts I and III. The balance of defendant's contentions are rejected. As modified, we affirm the judgment.

*Facts*

On July 11, 1970, John Dilday, age 23, and Eve Hindin, age 19, were hitchhiking in a northerly direction on Highways 101 and 1. In Santa Barbara they met 18-year-old Russell Volpi at the intersection of State Street and the highway. Sometime between 6 and 6:30 p.m. they were given a ride by the defendant who was driving a blue 1968 Volkswagen. The car had been stolen several hours earlier by the defendant from the All Right parking lot in Los Angeles where he had been employed as a parking lot attendant. John Dilday testified that the defendant was acting in a normal manner when he picked them up and was not drinking.

While driving north the defendant suggested that they stop at a liquor store in Santa Maria and get some "booze." They did so and purchased a fifth of Calvert's whiskey, a half gallon of Spanish wine and some other supplies. They resumed their journey and the defendant and Volpi drank the whiskey with 7-Up and Eve and Dilday were drinking the wine. As they entered San Luis Obispo, a single marijuana cigarette was passed around and smoked by all four occupants of the car. Dilday testified that he had no LSD or drugs in his possession and that he believed that neither he, nor Eve, nor Volpi had given the defendant drugs at any time.

When they left San Luis Obispo, Dilday testified they drove north on Highway 1. He stated that the defendant was not behaving in any unusual or erratic fashion and did not appear to be intoxicated. Upon reaching Ragged Point, about 161 miles north of Santa Barbara and 79 miles south of the Monterey County Airport, the defendant stopped the car. After five or ten minutes of conversation, he turned off the engine and the car lights and asked the other occupants of the vehicle to assist him in retrieving and delivering some dope hidden on a hill in the area. He offered them $500 each if they would help him.

The defendant insisted that Eve stay in the automobile while he proceeded up the hill with Dilday and Volpi. As soon as the three men had climbed the hill and walked near some trees, the defendant turned around with a gun in his hand and ordered Dilday and Volpi to get down on their knees. When Dilday asked, "What is going on brother" the defendant replied "just get down, I swear I will kill you." The defendant then ordered

them to lie flat on their faces with their arms outstretched over their heads. Immediately thereafter, Dilday heard a shot ring out. He felt stunned. He remembered hearing a groan from Volpi and recalled hearing a motor start. He got up and put his hand on Volpi's back. Feeling no response or movement by Volpi, Dilday ran for help. The automobile was no longer in the area.

Volpi was dead and Dilday had sustained wounds in the head and in an arm. On July 12, 1970, the Volkswagen was found in a parking lot at the Monterey Peninsula Airport. The next day police found a number of the personal belongings of Volpi, Dilday and Eve at a point approximately ¾ of a mile from the airport. On October 23, 1970, the remains of Eve Hindin were found in a remote area about six miles from the airport. She had a small hole in her skull, but the exact cause of death could not be determined by the coroner because of the poor condition of the remains. Evidence was produced indicating that the defendant had taken Eve's traveler's checks and had used them for personal purposes. On July 14, 1970, he had endorsed some of the checks and used the proceeds to purchase a train ticket from Washington, D.C. to Cheyenne, Wyoming.

The defense presented evidence indicating that the defendant had been hospitalized for "mental problems" a number of times during his lifetime and had started seeing a psychiatrist when he was 13 years of age. His last period of hospitalization was in April 1970. The defendant took the stand on his own behalf and testified that he had been in Los Angeles for approximately two or three weeks prior to July 11, 1970. He stated that he had consumed eight double shots of V.O. whiskey and 7-Up and a pint of Wild Turkey Whiskey on July 11 before he decided to steal the Volkswagen and drive to San Francisco. He declared that he heard a voice tell him to go to "Frisco," that he had heard this voice many times before and had numerous conversations with this voice. When he left Los Angeles, he took with him a .38 caliber snub-nose revolver that he had purchased from a "bum" in Los Angeles for $7. He further stated that although he had owned a gun before, he had never used a .38 caliber snub-nose.

The defendant then testified in substance as follows: He drank some cans of beer on the freeway between Los Angeles and Santa Barbara. After picking up the hitchhikers in Santa Barbara, he smoked at least two marijuana cigarettes before reaching the liquor store in Santa Maria. Thereafter, he drank additional amounts of whiskey and a beer containing a powdered substance that was given to him by Volpi. He also smoked some more marijuana. As a result, he became "high" and started hallucinating. He had difficulty driving and decided to stop at Ragged Point. At that time

he heard the voice again and talked with it. The voice told him that the other occupants of the car were taking advantage of him.

A normal recess was taken by the court at this point. Upon resumption of the proceedings the defense counsel advised the court that the defendant did not desire to resume the stand to continue testifying in his own behalf. He did not return and he was not cross-examined.

In rebuttal the People called Army Sergeant Frank Janiszewski. He testified that on July 2, 1970, while driving to El Paso on Texas Highway 27, he observed the defendant hitchhiking and gave him a ride. When they reached a remote desert area, the defendant pointed a weapon at him that looked like a black .38 snub-nose revolver and threatened to kill him if he made any fast moves. The defendant then took the Sergeant's money, credit cards and I.D. card from his billfold and handcuffed him to a billboard pole approximately ¼ mile from the highway. Ultimately, the Sergeant was freed and his car was recovered at the International Airport in El Paso. His credit cards were not found. The witness further testified that the defendant did not drink any alcohol during the trip nor use marijuana. He indicated that he did not observe anything unusual about the defendant's conduct or speech, other than the fact he was a little nervous.

The People then called Dr. James B. Hollingsworth, Senior Psychiatrist at Atascadero State Hospital, who had examined the defendant on four occasions as a court-appointed psychiatrist. He testified that in his professional opinion the defendant had a personality disorder, an antisocial personality, but he was not mentally ill at the time of the commission of the offense. The doctor did not find any evidence of brain damage and no indication of neurotic tendencies on the part of the defendant. It was Dr. Hollingsworth's opinion that at the time the defendant committed the crimes he did not have a substantially reduced mental capacity and was able to premeditate and deliberate. The doctor did not believe that either the alcohol or drugs taken by the defendant had impaired his capacity at all. Dr. Hollingsworth further indicated that he did not believe that the defendant was hearing voices or hallucinating. He concluded that the defendant was not in fact hallucinating because, "the manner in which he presented his story of what he was calling the voices and the visions does not fit a pattern of the hallucinations that we encounter."

Dr. Alfred Owre, Jr., another court-appointed psychiatrist, was then called as a rebuttal witness by the prosecution. He had examined the defendant on two occasions. Dr. Owre diagnosed the defendant as an antisocial personality. In his opinion, the defendant was not mentally ill at the

time of the commission of the offense. He believed that the defendant knew what he was doing despite the fact that he had drugs and alcohol and he stated that the defendant was able to premeditate and deliberate at the time of the commission of the offense. Dr. Owre further declared that he did not believe that the defendant had experienced hallucinations and opined that the defendant managed to get himself in and out of mental hospitals by simulating or imitating mental illness.

### Was It Prejudicial Error to Admit Evidence of the Robbery of Sergeant Janiszewski?

■ After examining the record we have determined that the evidence was properly admissible, but the court erred in its instructions to the jury on the subject. On the facts of this case we deem the error to be nonprejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

■ It is fundamental that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. (*People* v. *Sam,* 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700]; *People* v. *Kelley,* 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947].) When the purpose of introducing evidence of other crimes is not to show bad character but to establish some other fact in issue, the limited admissibility doctrine allows its admission for that particular purpose. (See Witkin, Cal. Evidence (2d ed. 1966) p. 300.) This principle is recognized in Evidence Code section 1101, subdivision (b) which provides that: "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." Therefore, in *People* v. *Archerd,* 3 Cal.3d 615, 638 [91 Cal.Rptr. 397, 477 P.2d 421], evidence of prior and subsequent murders which tended to prove identity, intent, malice, premeditation, motive, knowledge of means of commission, and modus operandi were held admissible in a murder prosecution despite its prejudicial effect. In *People* v. *David,* 12 Cal.2d 639, 646-647 [86 P.2d 811], a prior robbery was held admissible to show defendant's sanity and ability to devise and execute a deliberate plan. In *People* v. *Asher,* 273 Cal. App.2d 876, 913 [78 Cal.Rptr. 885] other offense evidence was held admissible to rebut a claim of diminished capacity.

■ When the other offense evidence is relevant to an issue the trial court must determine whether the probative value is outweighed by the possible prejudicial effect and admit or exclude it accordingly. (*People* v.

*Archerd, supra,* 3 Cal.3d 615, 638; Evid. Code, § 352.) "This balancing test is necessarily particularistic, depending not upon mechanically automatic rules, but upon the trial court's consideration of the unique facts and issues of each case. . . ." (*People* v. *Schader,* 71 Cal.2d 761, 774 [80 Cal.Rptr. 1, 457 P.2d 841].)

In the case at bench the robbery of Sergeant Janiszewski was only nine days from the murders in point of time. Proof of the defendant's conduct and state of mind during that incident tended to contradict the defendant's testimony of diminished capacity and tended to prove intent, motive, premeditation, deliberation and malice. In addition the testimony was relevant to impeach specific items in the defendant's testimony such as his length of stay in Los Angeles prior to July 11, 1970, and the period of time he had possession of the .38 snub-nose revolver prior to the commission of the murders.

To establish diminished capacity the defendant relied, inter alia, upon his testimony relating heavy drinking, marijuana smoking, and ingestion of drugs on July 11, 1970. Sergeant Janiszewski's testimony relative to the defendant's conduct and behavior before and during the July 2, 1970, robbery was relevant on the issue of defendant's ability to premeditate and deliberate on July 11, 1970. The Janiszewski robbery also was relevant on the factual issue of motive. The jury could believe that the defendant took Eve Hindin's traveler's checks for the purpose of financing his travels, and that his possession of them was not unplanned and inadvertent.

With reference to the instruction given to the jury in this area, there is a slight conflict between the clerk's transcript and the reporter's transcript.[1] A resolution of this conflict is unnecessary, because we concur with

---

[1]The clerk's transcript indicates that People's instruction No. 45 was given by the court. It is initialed by the court and dated March 2, 1971. It reads as follows:

"Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial.

"Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"1. That the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged;

"2. The existence or nonexistence of any fact testified to by him;

"3. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case.

"For the limited purpose for which you may consider such evidence, you must

the defendant that the court erred in its instruction to the jury. The instruction used was modeled on CALJIC No. 2.50.[2] The court deleted subparagraphs (2) and (3) and utilized subparagraphs (4) and (5) of CALJIC No. 2.50.

As we have previously indicated, motive and intent were in issue and those instructions (CALJIC No. 2.50 subparagraphs (2) and (3)) would have been proper. No issue existed requiring the jury to determine whether the defendant had the means to commit the crime. He did not deny his possession of the gun. Accordingly, CALJIC No. 2.50(5) should not have been given.

The instruction on common plan or scheme was also inappropriate. ■  When the identity of the perpetrator of the charged offense is in issue, evidence of an uncharged offense may be admitted to show a modus operandi common to the charged and uncharged offenses provided it meets the "distinctive common marks" requirements of *People* v. *Haston,* 69 Cal.2d 233, 245-247 [70 Cal.Rptr. 419, 444 P.2d 91]. ■  Since the defendant did not dispute the contention that he had perpetrated the acts charged herein, any instruction on "characteristic method, plan or scheme" was not relevant to any issue material to the People's case. (*People* v. *Schader, supra,* 71 Cal.2d 761, 775.)

weigh it in the same manner as you do all other evidence in the case.
"You are not permitted to consider such evidence for any other purpose."
The reporter's transcript reads as follows:
"You are not committed to consider such evidence for any other purpose."
In view of the phonetic similarity between "permitted" and "committed" we assume that the reporter's transcript contains a mistranscription.
[2]CALJIC No. 2.50 reads as follows:
"Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial.
"Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.
"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:
"1. The identity of the person who committed the crime, if any, of which the defendant is accused;
"2. A motive for the commission of the crime charged;
"3. The existence of the intent which is a necessary element of the crime charged:
"4. That the defendant had knowledge of the nature of things found in his possession;
"5. That the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged;
"6. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case.
"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.
"You are not permitted to consider such evidence for any other purpose."

We regard the error in giving this instruction to be harmless because we do not believe it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of error. (*People* v. *Watson, supra,* 46 Cal.2d at pp. 831, 836.) In retrospect, the correct utilization of CALJIC No. 2.50 probably would have been more damaging to the defendant. The jury would have been instructed to consider the evidence of another offense on factual issues in contention (intent, motive, premeditation, deliberation) rather than on issues which were conceded.

### Did the Court Abuse its Discretion in Permitting Sergeant Janiszewski and the Psychiatrists to Testify in Rebuttal?

Defendant contends that the testimony of Sergeant Janiszewski and Doctors Hollingsworth and Owre was properly a part of the People's case-in-chief and that the court abused its discretion by permitting them to testify in rebuttal. "While it is improper for the prosecutor to withhold evidence which is properly a part of his case in chief and offer it after the defense has closed its case, such evidence may be used by the prosecutor where it comes within the rules of impeachment and may be admitted on rebuttal to meet evidence upon a point put into dispute by the testimony for the defense." (*People* v. *Harrison,* 59 Cal.2d 622, 629 [30 Cal.Rptr. 841, 381 P.2d 665].)

With respect to the testimony of Sergeant Janiszewski, the prosecutor properly utilized his testimony to rebut specific statements of fact testified to by the defendant[3] and to rebut some aspects of the affirmative defense of diminished capacity asserted by the defendant. It should also be noted that there was no specific objection to the testimony of Sergeant Janiszewski on the ground of improper rebuttal. The sole objection made was on the ground of lack of materiality, a general objection. Evidence Code section 353, subdivision (a) codified the well established rule that error in admission is nonreversible unless "There appears of record an objection to . . . the evidence that was *timely made* and so stated as to make clear the *specific ground* of the objection or motion." (Italics added.)

The defendant relies on *People* v. *Mosher,* 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659] to support his position that the trial court abused its discretion in permitting the two court-appointed psychiatrists to testify in rebuttal. In *Mosher* a prosecution psychiatrist had interviewed the defendant on the day of the offense and had been involved in the prepara-

---

[3]Such as his length of stay in Los Angeles and the time of the acquisition of the .38 snub-nose revolver.

tion of the prosecution. He was called to testify on rebuttal concerning the defense of diminished capacity. The court stated in *Mosher* (on p. 399): "Under such circumstances the prosecution cannot persuasively contend that it should not have introduced the doctor's testimony as part of its own case. [Citation.] The order of proof, however, lies within the sound discretion of the trial court under Penal Code section 1094. In this case the defense raised no objection to the rebuttal testimony of Dr. Rapaport. In the absence of an objection to the trial court, we certainly cannot hold that it abused its discretion in permitting Dr. Rapaport to testify on rebuttal. [Citations.]"

On the facts of this case we find no abuse of discretion in permitting the psychiatrists to testify in rebuttal. Here again the defendant did not interpose a proper specific objection to the proposed testimony.[4] Furthermore, in this case we deal with court-appointed psychiatrists and a situation where the exact nature of the diminished capacity defense the defendant intended to present was not manifest to the People until after the defendant had testified.

### Was the Court Required to Secure a Waiver of the Privilege Against Self-incrimination When the Defendant Withdrew His Plea of Not Guilty by Reason of Insanity?

After the jury returned a verdict of guilty on all three counts, the defendant requested leave to withdraw his plea of not guilty by reason of insanity. The defendant's counsel indicated that he was doing so because the court-appointed psychiatrists found the defendant to be sane and he had no other psychiatrist's testimony to present to the court bearing upon the issue.[5] The court then explained to the defendant his right to a jury

---

[4] The objection was made on the grounds of irrelevancy and immateriality.

[5] The following proceedings were held outside the presence of the jury:

" 'Now, Mr. Hovis, you advised the Court last evening upon the return of the verdict in the guilt phase of the trial that your client wished to withdraw his plea of insanity; is that correct?

" 'Mr. Hovis: His plea of not guilty by reason of insanity.

" 'The Court: Not guilty by reason of insanity, I am sorry.

" 'Mr. Hovis: Based upon the fact that the doctors appointed by the Court to report back to the Court have submitted their reports and I assume would testify in accordance with their reports. That they have the opinion that the Defendant was legally sane at the time of the commission of crime and the fact that we have no other testimony to present to the Court. psychiatric testimony, to present to the Court bearing upon the issue.

" 'The Court: You understand that the burden of proof lies with the Defendant on a trial of this kind?

trial, his right to subpoena witnesses in his own behalf, and his right to confront and cross-examine witnesses. The defendant waived each of these specific rights and the court permitted him to withdraw his plea of not guilty by reason of insanity. There was no explanation of the privilege of self-incrimination by the court and no express waiver of the privilege by the defendant.

The defendant roots his contention that such a waiver is required in *People* v. *Redmond,* 16 Cal.App.3d 931, 938-939 [94 Cal.Rptr. 543]. In that case the trial court was reversed because it summarily denied a motion to withdraw a plea of not guilty by reason of insanity. In outlining appropriate procedures to be followed by a trial judge in hearing a motion for withdrawal of a not guilty by reason of insanity plea, the court stated: ". . . a series of questions should be propounded to such defendant and to his counsel and the answers thereto be made of record to meet requirements of *Boykin* v. *Alabama* [citation]; *In re Tahl* [citation]; and *People* v. *West* [citation], *insofar as they might be applicable to the situation presented.* (Italics added.) . . . What we state in this opinion, of course, is not intended to apply to situations where there is no doubt of a defendant's sanity in the mind of the trial court and the reports of examining psychiatrists unanimously indicate that such defendant was sane at the time of the offense. Free withdrawal of the insanity plea under such circumstances should be permitted as it has been in the past."

Here the record indicates there was no doubt as to defendant's sanity in the mind of the trial judge,[6] and both court-appointed psychiatrists indicated he was sane at the time of the commission of the offense. Moreover, the defendant had already taken the stand and testified in his own defense in the guilt phase of the trial. A viable privilege against self-incrimination was no longer in existence.

" 'MR. HOVIS: That's correct, your Honor.

" 'THE COURT: Now, Mr. Gay, is it your wish to withdraw your plea of not guilty by reason of insanity?

" 'THE DEFENDANT: Well, I can only say that I don't believe I could put it any better than what Mr. Hovis just did. In other words, I would act in accordance to advice of counsel, yes.' "

[6] At that time the court made the following statement:

" 'THE COURT: All right. In light of the statement of counsel that he has no evidence to present in such a trial and keeping in mind that the burden of proof lies with the Defendant in a trial of this kind relative to the insanity plea, the Court will now permit you to withdraw your plea of not guilty by reason of insanity. Do you so withdraw it?' "

### Did the Prosecutor Commit Prejudicial
### Misconduct in Argument?

Misconduct in argument may not be assigned on appeal if it was not assigned at the trial unless the misconduct contributed to the verdict or was so unredeemable that nothing could have cured it. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Mitchell,* 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211].) In this case no objections were made during the trial to the argument of the prosecutor and no admonitions were requested.

Our examination of the record reveals a degree of overzealousness on the part of the prosecutor and comments by him in several areas that were not proper. We do not attempt to catalog all of these remarks but do cite a few examples of statements that cross the line of prosecutorial propriety. Remarks that may appeal to passion and prejudice[7] and testimonial statements by the prosecutor[8] have no place in argument. (*People* v. *Mc-Dowell,* 27 Cal.App.3d 864, 881 [104 Cal.Rptr. 181]; *People* v. *Hail,* 25 Cal.App. 342, 357 [143 P. 803].) The ultimate question which must be answered is whether it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comments attacked by the defendant. Our review of the entire record establishes that the errors complained of did not constitute such prejudicial error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

The judgment is modified to provide for the punishment of life imprisonment instead of death on both counts I and III and as so modified is affirmed.

Wood, P. J., and Thompson, J., concurred.

---

[7] " 'Oftentimes I think in representing the people as the District Attorney of this county, that it is unfortunate that I do not have sitting beside me a member of the family so that it would be flesh and blood and you could see the suffering and the pain that such individual has gone through because of such an incident as was committed by this monster, this executioner.' "

[8] " 'We feel, ladies and gentlemen of the jury, that we have proven to you beyond any possibly doubt, and I don't think there has been a case in any Court in San Luis Obispo County that has been proven more thoroughly, stronger, by any evidence that one of the most heinous, horrible, ghastly executions and murders that has ever been committed.' "