[No. B018421. Second Dist., Div. One. Mar. 30, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK PADILLA MENDIBLES, Defendant and Appellant.

**1284**

COUNSEL

Dennis A Fischer and John M. Bishop for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Paul C. Ament and Joan Comparet, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SPENCER, P. J.—

### INTRODUCTION

Defendant Frank Padilla Mendibles appeals from a judgment of conviction entered after a jury trial. The jury found defendant not guilty of four counts of forcible lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (b)) [counts I and II, in which the victim allegedly was Pauline; count III, in which the victim allegedly was Elizabeth; and count V, in which the victim allegedly was Mary]. However, the jury found defendant guilty of four further counts of forcible lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (b)) [counts IV and VIII, in which the victim was Elizabeth and counts VI and VII, in which the victim was Mary]. The jury was unable to reach a verdict on a final count of the same offense [count IX, in which the victim allegedly was Elizabeth], after which a mistrial was declared and count IX was dismissed on the People's motion.

The jury further found true the allegations set forth in connection with counts IV and VII that at the time of the commission of the offenses, defendant occupied a position of special trust as the victims' common-law stepfather and committed an act of substantial sexual conduct, i.e., oral copulation (Pen. Code, § 1203.066, subd. (a)(9)). Thereafter, defendant was sentenced to state prison for the term prescribed by law.

### STATEMENT OF FACTS

Pauline, Elizabeth and Mary lived with their mother, Ms. L., and defendant for more than two years prior to January 1983. At the time of trial, Pauline was 13 years old, Elizabeth was 12 years old and Mary was 10 years old. Their respective dates of birth were August 23, 1971; December 11, 1972; and August 14, 1974.

One day while the girls were residing with their mother and defendant at the Evergreen Motel, the three of them took a shower together. The door was locked, but defendant managed to unlock it and entered the bathroom; according to Elizabeth, he did this with a butter knife. After entering the bathroom, defendant removed his clothing and entered the shower with the girls. According to Pauline, he made the three of them wash his erect penis; Pauline was afraid of defendant and so did as she was told. According to Mary, defendant made her place her hand on a rag and wash his penis; she tried to get away, but defendant pulled her back. She was afraid of defendant at the time and has since remained afraid of him. Elizabeth initially testified defendant touched her in the vagina while she was in the shower, but on cross-examination stated no one touched defendant while they were all in the shower; instead, when defendant said, "wash me," she and her sisters got out of the shower. Elizabeth was frightened at the time. According to Ms. L., she and the three girls lived with defendant at the Evergreen Motel for approximately two weeks prior to March 9, 1981.

During the years defendant was living with them, he punished Pauline by spanking her and hitting her with a cord on her back, legs and arms. She bled when he hit her and has scars from the beatings. As a consequence, Pauline became afraid of defendant and has remained frightened of him. Defendant also hit Elizabeth with a cord on her legs, back and buttocks; he whipped her. In addition, defendant threatened Elizabeth that he would hit her if she ever told anyone what he did to her and likewise threatened to hit her if she did not perform oral copulation on him. On occasion, defendant also hit Mary with a belt and a cord on her legs, arms and buttocks.

One day while they were all living with defendant at the Vagabond Motel, Pauline and Elizabeth were home alone with defendant; they were being punished and were grounded. Mary had gone out with their mother. Defendant told Pauline if she and Elizabeth would get into bed with him, he would see that their mother rescinded the punishment. Consequently, they both got into bed with him; Pauline was next to defendant and Elizabeth was on the far side of the bed. When they were in the bed, defendant told Pauline to pull down her underwear; he then got on top of her and performed or attempted an act of intercourse which hurt her. Defendant warned Pauline not to tell anyone and she did not for some time. According to Ms. L., she and the three girls lived with defendant at the Vagabond Motel from March 9, 1981, to the summer of 1981.

One day while they all lived on Nordoff Street, Mary was ill and consequently stayed home with defendant alone. She was lying on the couch watching television, when defendant put his finger in her vagina; he then got on top of her and attempted an act of intercourse which hurt her. Mary

tried to pull away from defendant, but he was too strong and she was afraid to resist any further. On another occasion, Mary was in her mother's room lying on the bed when defendant approached her. He unzipped his trousers, then pulled her head toward him and forced her into an act of oral copulation; he held her head until he ejaculated. She was very frightened during this episode.

Mary never told anyone about these incidents until she started to bleed while taking a shower when she was eight years old. Pauline recalled bathing with Mary when they saw blood in the bathtub/shower. It was then that she and Mary told their aunt, Mrs. H., what defendant had done. According to Ms. L., she and the girls resided with defendant on Nordoff Street on two different occasions—from September 23, 1981 until October 6, 1981, and from the summer of 1982 until January 1983.

One day while they were all residing on Herrick Street, Pauline and Elizabeth were home alone with defendant; Pauline was watching television, while Elizabeth was in her room. Defendant entered Elizabeth's room, undressed and told her to do the same. When Elizabeth refused, defendant pulled her head toward him and forced her into an act of oral copulation. At the same time, defendant placed his finger in her vagina. Thereafter, defendant got on top of Elizabeth and attempted or performed an act of intercourse. She tried unsuccessfully to get away from defendant during these acts; she was and is very much afraid of defendant.

On cross-examination, Elizabeth testified this incident occurred when she and Pauline were home sick with the chicken pox; their mother had gone across the street to visit defendant's parents. While Elizabeth was watching cartoons with Pauline, defendant called to her from the bedroom. Elizabeth went into the bedroom, but when defendant told her what he wanted, she left. Defendant called her back and when she reentered the bedroom, defendant was nude. He then forced her to perform an act of oral copulation until he ejaculated, after which he put his finger in her vagina and then attempted or performed an act of intercourse. According to Ms. L., she and the girls moved to Herrick Street with defendant on October 6, 1981, and resided there until the summer of 1982, after which they returned to Nordoff Street. Ms. L. was unaware any of these things had happened to her children until January 1983.

The girls' uncle, Hector Lopez, also resided at the Evergreen Motel. One day while the girls, Ms. L. and defendant were living at the Vagabond Motel, Uncle Hector poked Pauline in the vagina with his hand. Uncle Hector also got on top of Elizabeth on one occasion and attempted or performed an act of intercourse. The girls' mother told them not to tell

anyone what Uncle Hector had done. Ms. L. acknowledged she told the girls not to say anything about their Uncle Hector, in that she wished to protect her brother; however, she never told them to lie about what defendant had done.

Astrid Heger, M.D., examined Pauline, Elizabeth and Mary on September 21, 1984. She examined each out of the presence of the others but in the presence of their grandmother; she took a history from each girl relating what had happened and also took a more general medical history from the grandmother to ascertain whether any of the girls had suffered any accidents which might affect Dr. Heger's findings. Thereafter, Dr. Heger performed a macroscopic and microscopic examination of each of the girls. In all, each examination took approximately one hour. During the course of her microscopic examination, utilizing a binocular 15-power colposcope equipped with a camera, she took six or more stereoscopic slides of each girl's external genitalia. Dr. Heger limited her examinations to the external genitalia, inserting nothing into the vaginal opening. In her opinion, physical intrusion is unnecessary; trauma can be observed visually by a trained individual.

In her visual examinations of prepubescent girls, both macroscopic and microscopic, Dr. Heger looks for a hymen which is not disrupted and is smooth. The more the vagina has been penetrated, the more stretched the hymen becomes and the more pronounced the patterns of scarring or disruption appear. Vulvar intercourse does not involve penetration of the hymen; consequently, scarring will not occur. There is no danger of an experienced observer mistaking a wrinkle for a scar; the two features have very distinct appearances. In a case of digital penetration, there may or may not be scarring, but any scarring which does occur will be in a different area from that where the majority of scarring from penile penetration occurs. Certain accidents may cause injury to the external female genitalia. The location of the injury and the pattern of scarring, as well as the patient's case history, help to determine whether injury is due to penile or digital penetration or to some accident. In Dr. Heger's experience, there is one scar which is classic in very young children for a certain type of sexual abuse. Although it does not involve hymenal tearing, it appears consistently in almost 90 percent of the girls who describe painful vaginal penetration.

Upon examining Mary, Dr. Heger found scarring and a hymenal opening which was twice the normal size for a 10-year-old female. The findings were consistent with sexual abuse and specifically with vulvar intercourse. She also noticed an odor which she considers a significant "soft" sign of sexual abuse. In examining Elizabeth, Dr. Heger observed a large mound of scar tissue or adhesion, as well as other scarring. The findings were consistent

with sexual abuse and specifically with penile penetration. In examining Pauline, Dr. Heger found an extreme stretching and complacency of the hymenal tissue, as well as extensive evidence of scarring. The findings were consistent with sexual abuse and specifically with penile penetration. However, the findings were not as clear cut as with Elizabeth and Mary. At the time Dr. Heger conducted the examination, Pauline no longer was prepubescent; she had been menstruating. Dr. Heger acknowledged her findings also could be consistent with an adolescent becoming sexually active after the onset of menstruation.

## DEFENSE

Harold Becker, M.D., examined Pauline, Elizabeth and Mary on January 19, 1983. He found no evidence of any recent trauma, lacerations or bruises on Mary or Elizabeth and no evidence of penetration of the vagina. Dr. Becker observed bruises on the back of Pauline's legs, but found no other signs of trauma. However, Dr. Becker did not look for scarring of the hymen; he had no training in that area [or] in how to examine children who complain of sexual molestation. He had no opinion as to whether the girls had or had not been sexually abused; he was not asked to determine that at the time he examined them, but was only asked to evaluate their physical condition.

Annette Provencio is defendant's sister; she never saw defendant mistreat the children. Pauline had told her she was afraid of her mother, who hit her with clothes hangers and her fist; according to Pauline, her mother did not like her because she looked like her father. Pauline also told Mrs. Provencio's husband, Bobby, that she was afraid of her mother; however, Mr. Provencio never saw any bruises on Pauline. He did see her mother hit Pauline with a brush and once he saw defendant spank Pauline.

Young Oh, M.D., was the pediatrician for Pauline, Elizabeth and Mary during 1981. She treated Elizabeth for impetigo, a skin disease, but saw no signs of physical abuse. She also treated Mary during that year and failed to observe any signs of physical abuse. Dr. Oh acknowledged, however, that she did not look for signs of abuse when she examined Elizabeth and Mary.

Alison O'Chiae, a criminalist for the Los Angeles Police Department, examined the rape kit prepared for Mary on January 19, 1983. She detected neither spermatozoa nor seminal fluid in the vaginal, anal or oral slides or swabs. In addition, she found no evidence of blood or semen in the clothing she inspected which Mary had been wearing at the time of the January 19 examination.

Richard Nallick, M.D., is a gynecologist who is expert in the use of the colposcope and the interpretation of its findings. Nonetheless, he does not consider himself a specialist in child sexual abuse; he has examined only five or six children who were rape victims. While he considers the colposcope a valuable tool in detecting evidence of recent rape or other sexual trauma, he does not consider it useful in detecting evidence of older, healed sexual trauma. Dr. Nallick viewed nine colposcopic slides taken of Pauline; he found two areas which were not within the normal range. In his opinion, none of the marks appeared to be more than a few months old. Dr. Nallick viewed similar slides of Elizabeth and Mary; in his opinion, the slides revealed nothing abnormal. He did concede he found nothing on the slides which would rule out either digital penetration or the possibility of vulvar intercourse, but remained adamant in his view either partial or full hymenal penetration must be ruled out with respect to both Pauline and Elizabeth. Dr. Nallick also acknowledged the size of Mary's hymenal opening appeared to be quite large for a child her age.

Danny Rodriguez is defendant's nephew; he is acquainted with Pauline, Elizabeth and Mary. One day in September 1984, while they were riding a school bus, he observed a large bruise on Pauline's leg. When he asked her about it, she said her mother had hit her with a cord. Pauline also told him she was going to make up a lie about defendant to put him in jail. Mary and Elizabeth started to say something, but Pauline put her hands over their mouths.

Defendant testified in his own behalf. He presented an alibi defense to the shower incident (counts I, III and V), introducing records to show he was registered at the Evergreen Motel on only one day, February 14, 1981. At the time, he was working at PSI; he worked from 6:30 a.m. to 2:30 p.m. that day, arriving home at approximately 2:45 p.m. When he arrived, the girls told him about a movie which was being filmed next door. Thereafter, defendant's sister picked up the girls at his request and he spent the night alone with Ms. L. After the girls left with his sister, defendant went out at approximately 5 p.m. He shot pool until midnight, then went to a friend's residence where he remained until 2:30 a.m. Only then did he return to the motel. He further testified he was a good, affectionate father to the girls; he never beat them or mistreated them in any way.

Defendant maintained he was home only once when the girls took a shower, and that occurred while they were living on Herrick Street, not at the Evergreen Motel. He denied ever seeing the girls naked or other than fully dressed, stated they never sat on his lap and never hugged him when they were wearing nightgowns with one exception. He asserted he was never alone with the children during the day or night and did not remember them

being home sick during the day. Defendant expressly denied ever being sexually aroused by the girls or ever molesting them. He also denied ever hitting the girls with anything other than his hand and then claimed he only spanked them. In addition, defendant offered a motive for the girls to lie; he stated their mother had told him several days before January 18, 1983, when he told her he was leaving her and began to move his belongings from the apartment, that if he left her he was going to pay; " 'I would be sorry' were her exact words."

Defendant also testified concerning the events of January 18 and 19, 1983. According to defendant, Mrs. H. arrived at the apartment on January 18; she wanted to have the three girls spend the night with her, to which he and Ms. L. agreed. Defendant had begun moving his belongings from the apartment a few days earlier. When defendant returned home on January 19, Mrs. H. and Ms. L. were coming down the stairs; Ms. L. was in tears. Defendant asked what was wrong, to which Ms. L. replied, "I will see you in court." No one told defendant Mary was bleeding or that the girls were being taken to the hospital. In defendant's opinion, the only reason he was charged with these crimes was to protect the victims' uncle, Hector Lopez, who had molested them, and to permit Ms. L., their mother, to get even with him.

REBUTTAL

The People offered the testimony of Mrs. H. in rebuttal. She arrived at the apartment at 7:30 p.m. on January 18, where she found Pauline and Mary alone. She began to prepare the children some supper and sent them to bathe in the meantime. After the children had bathed, Mrs. H. observed them whispering to each other. Mrs. H. asked what they were discussing, at which Pauline blurted out that defendant made her take showers with him and wash him. Mary then told Mrs. H. she was bleeding and had bled other times; defendant had been touching her. Mary also stated she was afraid to wear dresses because defendant touches girls who wear dresses. Mrs. H. thereupon took the two girls home with her.

The following day she picked up Elizabeth at school and returned to the apartment, where she told her sister, Ms. L., what Mary and Pauline had related to her. Ms. L. was very shocked. She said nothing about defendant leaving her, but proceeded to pack her belongings and those of the children. Defendant returned home and, observing Ms. L. removing pictures from the wall, asked what was going on. Ms. L. replied, "I am going to get . . . out of here." Defendant did not try to stop her; instead, he said, "I didn't do anything." As Mrs. H. and Ms. L. were leaving the apartment with the girls, Ms. L. told defendant Mary was bleeding and she was taking the girls

to the hospital "and see what is going on." Defendant again said, "I didn't do anything," and returned to the apartment.

Mrs. H. further testified she had been growing suspicious during regular visits to the girls' home that month because defendant would not permit them to spend the night with her. During November and December 1982, Mrs. H. had observed bruises on Pauline, some of which were extreme; she asked about them and Pauline related that defendant hit her with a belt and used a cord on her legs.

## SURREBUTTAL

Defendant has known Mrs. H. since 1979; she paid Ms. L. to baby-sit with her three-year-old daughter during the time defendant lived with Ms. L. On January 19, 1983, Mrs. H. and Ms. L. were leaving as defendant arrived. He was walking up the stairs and asked, "Where are you going?" When Ms. L. stated, "I will see you in court," defendant replied, "For what?" He never said, "I didn't do it."

## CONTENTIONS

### I

Defendant contends the trial court erred in admitting in evidence the expert medical opinion of Dr. Heger, in that her opinion was based on a new technique which the People had failed to demonstrate was generally accepted as reliable in the relevant scientific community.

### II

Defendant further contends the trial court erred in admitting Dr. Heger's testimony, in that defendant clearly was prejudiced by the exclusion of his expert from Dr. Heger's examination of the victims.

### III

Defendant asserts the trial court erred prejudicially in permitting the improper rebuttal testimony of Mrs. H., including inadmissible hearsay relating to uncharged sexual offenses.

### IV

Defendant avers the trial court erred prejudicially in giving the People's special instruction on the "force, violence, duress, menace, or threat of

immediate bodily injury" element of the charged offenses, which contained the following language: "Psychological coercion, without physical touching, may constitute an application of force or may fall within the definition of duress or menace as defined above."

V

Finally, defendant contends the prosecutor committed prejudicial misconduct by loudly referring in a bench conference to excluded uncharged offenses to which Mary purportedly was subjected and in arguing by innuendo the court had kept other similar evidence of guilt from the jury.

DISCUSSION

I

 Defendant contends the trial court erred in admitting in evidence the expert medical opinion of Dr. Heger, in that her opinion was based on a new technique which the People had failed to demonstrate was generally accepted as reliable in the scientific community. We disagree.

In forming an opinion whether the victims had suffered injuries consistent with sexual abuse, Dr. Heger relied primarily on patterns of scarring, deformities and other non-normal changes in the hymens of these children. For part of her examination, she used a colposcope, a binocular device which permits 15-power magnification, thereby allowing microscopic examination of the area. A camera is attached to the colposcope and will take stereoscopic slides to preserve the results of the examination. Defendant characterizes all of the foregoing as the use of a new scientific technique subject to the stringent requirements of *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].

 *Kelly* requires that new scientific techniques meet a two-prong test to be admissible; "(1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*Id.,* at p. 30, italics original.) The reliability and acceptance of the technique in the relevant scientific community must be demonstrated "by means of qualified and disinterested experts." (*People* v. *Shirley* (1982) 31 Cal.3d 18, 54 [181 Cal.Rptr. 243, 641 P.2d 775].)

However, there is a distinct difference between the development of a new scientific technique, i.e., "a novel method of proof" (*Kelly, supra,* 17 Cal.3d

at p. 30), and the development of a body of medical knowledge and expertise. As *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] notes: "It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his [or her] personal opinion on the stand—even if he [or she] qualifies as an expert—the jurors may temper their acceptance of [t]his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative. [Citations.] For this reason, courts have invoked the *Kelly-Frye* rule primarily in cases involving novel devices or processes . . . . We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association [citation]." (At pp. 372-373.)

■ Characteristic of those new techniques subject to the *Kelly* requirements of reliability and acceptance in the relevant scientific community are such devices or analyses as hypnosis-induced testimony (*Shirley, supra,* 31 Cal.3d 18), voiceprint identification (*Kelly, supra,* 17 Cal.3d at p. 30), new systems of blood typing (*Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647, 653-656 [51 Cal.Rptr. 254, 414 P.2d 382]), the use of "truth serum" or sodium pentothal (*People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577]), the use of a scanning electron microscope to detect particles of gunshot residue (*People* v. *Palmer* (1978) 80 Cal.App.3d 239, 250-255 [145 Cal.Rptr. 466, 1 A.L.R.4th 1056]), or bite-mark identification (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 619-625 [143 Cal.Rptr. 61]).

■ In contrast, the expression of expert medical opinion as to the cause of a wound or injury falls, as *McDonald* notes, outside that realm. Indeed, it is settled by "a long line of California decisions" that an expert medical witness is qualified "to give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself." (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249 [203 Cal.Rptr. 450 [681 P.2d 291].) Such a diagnosis need not be based on certainty, but may be based on probability; the lack of absolute scientific certainty does not deprive the opinion of evidentiary value. (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 507 [95 Cal.Rptr. 919].) Further, a medical diagnosis based on medical literature will not be viewed as a new scientific technique, but simply the

development of an opinion from studies of certain types of cases. (See *People v. Phillips* (1981) 122 Cal.App.3d 69, 87 [175 Cal.Rptr. 703].)

■ Characteristic of those instances in which diagnosis is considered to be no more than the expression of expert medical opinion are a determination death resulted from strangulation (*People v. Memro* (1985) 38 Cal.3d 658, 692 [214 Cal.Rptr. 832, 700 P.2d 446]), a conclusion rectal abrasions indicate anal intercourse without the use of a lubricant (*People v. Stanley* (1984) 36 Cal.3d 253, 256 [203 Cal.Rptr. 461, 681 P.2d 302]), the determination death was caused by a blunt instrument similar to or consistent with a baseball bat (*People v. Wiley* (1976) 18 Cal.3d 162, 166 [133 Cal.Rptr. 135, 554 P.2d 881]), the analysis of whether a wound was self-inflicted (*People v. Cole* (1956) 47 Cal.2d 99, 103-105 [301 P.2d 854, 56 A.L.R.2d 1435]), a conclusion death was caused by a "heavy instrument such as a bolo machete" (*People v. Corona* (1978) 80 Cal.App.3d 684, 693-694 [145 Cal.Rptr. 894]), the use of battered child syndrome to determine a child's injuries were not suffered accidentally (*People v. Jackson, supra,* 18 Cal.App.3d 504), and the determination certain bruises were not caused by a fall (*People v. Cooley* (1962) 211 Cal.App.2d 173, 199 [27 Cal.Rptr. 543]).

Less typical, but still within the realm of acceptable expert medical opinion, is the diagnosis of an esoteric form of mental illness known as "Munchausen's syndrome." (*People v. Phillips, supra,* 122 Cal.App.3d at p. 87.) In the latter case, all that was required was the existence of a body of literature, involving the study of similar cases, upon which such a diagnosis could be based. (*Ibid.*)

■ In the instant matter, Dr. Heger examined the victims' external genitalia physically, both macroscopically using her naked eye and a high-powered and focused source of light and microscopically using a colposcope with 15-power magnification. She paid particular attention to the victims' hymens, watching for certain characteristics observed in normal hymens of prepubescent females or for certain patterns of scarring, deformities and other changes observed in prepubescent females who had been subjected to sexual abuse. In the preceding three years, Dr. Heger had examined more than 400 children who complained of sexual abuse and well over 1,000 prepubescent females altogether. She had conducted a study of preadolescent and adolescent girls which included both those who complained of sexual abuse and those who made no such complaint.

She is well-versed in the growing body of literature which describes both the normal condition of the hymen in prepubescent females and the changes associated with sexual abuse. She made both macroscopic findings and

microscopic findings based on her observations and preserved her microscopic findings on stereoscopic slides for later study and examination.

It is clear there was no novel device involved. The colposcope is an instrument in general use in the medical community which has value in detecting sexual abuse or rape, as acknowledged by defendant's expert, Dr. Nallick. Even if the colposcope were not in general use, it does nothing more than provide binocular magnification of 15 power. In this sense, it is nothing more than a weak microscope—an instrument long accepted as scientifically reliable.

Neither did Dr. Heger's methodology involve the application of any new scientific technique. Her opinion was based entirely upon visual examination and the observations she made therein. She established there is a body of literature reporting medical studies upon which she could base the conclusions she drew from her observations. Moreover, the diagnosis of sexual abuse or rape from the observation of certain marks or scarring is nothing new. (See, e.g., *People* v. *Stanley, supra,* 36 Cal.3d 253.) The sole "novelty" apparent here is the analysis of injury to a specific portion of the external genitalia of prepubescent females; that in itself cannot remove the subject matter from the realm of legitimate scientific expertise. In sum, the testimony here is no different qualitatively from the analysis of any other wound or injury. Hence, the People were not required to prove the reliability and general acceptance of a "new scientific technique" in the relevant medical community. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30.)

■ Where expert opinion evidence is offered, much is left to the discretion of the trial court. (*People* v. *McDonald, supra,* 37 Cal.3d at p. 373.) The trial court is given wide latitude in determining the qualifications of an expert. That determination will not be disturbed on appeal except for a manifest abuse of discretion, i.e., where " ' "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." ' " *(People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372], italics original; quoting from *People* v. *Hogan* (1982) 31 Cal.3d 815, 852 [183 Cal.Rptr. 817, 647 P.2d 93].) ■ An individual is qualified to testify as an expert "if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates." (Evid. Code, § 720; *Chavez, supra,* 39 Cal.3d at p. 828.)

■ Dr. Heger has been a practicing pediatrician for 12 years; she became board certified in pediatrics prior to trial. Dr. Heger serves as an instructor in pediatrics at the University of Southern California School of Medicine; she is the director of that institution's child sexual abuse

program; serves as a consultant for Children's Institute International, a private institute engaged in the study of sexual abuse in children, and she serves on a County of Los Angeles ad hoc committee which is developing protocols and guidelines for the medical community at large to use in detecting sexual abuse in children. As noted *ante,* page 1294, she has examined more than 400 children suspected to be victims of sexual abuse. While Dr. Heger does see herself as a child advocate, she means by that an advocate for the child's well-being, *not* an individual who takes sides. Dr. Heger was instructed in the use of the colposcope by Drs. Bruce Woodley and Paul Brunner and considers herself an expert in its use; the defense expert, Dr. Nallick, confirmed Dr. Heger's expertise.

Dr. Heger undertakes a three-stage examination of a child suspected to be the victim of sexual abuse. First, she takes a medical history; she ascertains the child's version of what is wrong and what caused it and takes a more general medical history from a knowledgeable adult to determine whether the child has suffered any accidental injury in the past which may be reflected in Dr. Heger's physical findings. Second, she performs a macroscopic examination of the child's external genitalia, using her naked eye and a strong, focused light source. Third, she performs a microscopic examination, using the colposcope. The magnification thus gained permits the user to view and evaluate patterns of vascularity, including neovascularity, and to examine the genitalia more closely for scarring, the presence of scar tissue, or a normal appearance.

The colposcope is essential for diagnosis, i.e., to determine whether a pattern is scarring or a normal condition, in approximately 10 percent of cases. Dr. Heger documents her microscopic findings with stereoscopic slides taken by the camera attached to the colposcope. While later leisurely examination of the slides can be quite helpful and sometimes results in a change of Dr. Heger's initial opinion, she considers her direct observations a better diagnostic tool than the slides alone. However, it is possible to make a correct diagnosis using the slides alone and Dr. Heger often has been called upon to review other physician's slides to confirm or contradict the diagnosis originally made. There is a somewhat greater margin of error in using the slides alone, with a bias toward seeing normality.

In her macroscopic examination, Dr. Heger looks for patterns of change, scarring, deformities, changes in vascular patterns and changes in the size of the hymenal opening, as well as lacerations and other evidence of acute (fresh) abuse. In cases of chronic (ongoing or old) abuse, she primarily looks for a pattern consistent with abuse. The patterns of scarring involved depend upon the type of abuse; oral copulation, digital penetration or approximately half the cases of anal penetration may leave no scars at all. In

cases of penile penetration, Dr. Heger looks for scarring of the hymen itself, considers the condition of the hymen, the size of the opening, scarring which transects or radiates from the hymenal opening, circumferential scars, scarring in the hymenal entryway and chronic changes to the hymen (it may be round in the sense of having scalloped edges, rubbed down to a ridge of tissue or have large lesions of scar tissue).

In Dr. Heger's experience, recognized literature describes a normal pre-pubescent hymen as generally thin, smooth-edged tissue with no scarring. When scarring occurs, the body grows new blood vessels in that area (neo-vascularity); such patterns therefore serve to confirm the presence of scarring. When the hymen is penetrated by the erect penis, scarring will, in Dr. Heger's experience and as reported by existing literature, take several forms. The scars may either radiate from or run perpendicular to the hymenal opening; scarring also will appear in the posterior fourchette and, in the majority of instances, if the hymenal opening is compared to the face of a clock most scarring will occur between 3 o'clock and 9 o'clock.

In Dr. Heger's opinion, special expertise is required to recognize the trauma and scarring patterns in the external genitalia. Many studies discuss normal versus abnormal findings of children's genital anatomy; in addition, there are studies done over a period of time with a view to establishing the parameters of normal vaginal size and the standard size of hymenal openings. Dr. Heger relied on several articles and studies in this field to determine normal size, among them those conducted by Cantwell, Crowell, Tiera and one she herself conducted involving 120-150 preadolescent and adolescent girls. There are published, documented scientific studies of children describing the size of the hymenal opening correlated to sexual abuse or penile penetration, including one by Crowell. However, to date, there is no information available correlating the entire range of standard deviations from the norm; hence, Dr. Heger attaches the least significance to the size of the hymenal opening in evaluating whether there has been sexual abuse. She gives far greater significance to the pattern of scarring, distortion, and the type of hymenal damage.

Although the study of child sexual abuse is relatively new, it has become a major area of focus in medicine within the last three years. Dr. Heger is actively involved in developing the area; she has published one article, had a second accepted for publication, has a third in development and has contributed a chapter jointly with other physicians for a book on the subject. Although the area presently is not a medical subspecialty, Dr. Heger believes it will be; at this point, she considers it a part of pediatrics.

Based on the foregoing, there is no ground for setting aside the trial court's determination Dr. Heger possessed sufficient expertise on the subject

of child sexual abuse to testify as an expert on that subject. Most emphatically, the evidence does *not* show Dr. Heger " ' "clearly lacks qualification as an expert . . . ." ' " (*People* v. *Chavez, supra,* 39 Cal.3d at p. 828, italics deleted.) Accordingly, there is no abuse of discretion justifying reversal. (*Ibid.*)

## II

▆▆▆ Defendant further contends the trial court erred in admitting Dr. Heger's testimony, in that defendant clearly was prejudiced by the exclusion of his expert from Dr. Heger's examination of the victims. Again, we disagree.

On September 5, 1984, after the prosecution gave notice of its intention to have Dr. Heger examine the three victims and sought the trial court's approval thereof, the court granted a defense request to have a defense expert present at the examination "as an observer only," but denied the defense request to have its expert conduct a separate examination. As the court noted, it was not a matter of discovery; the prosecution was entitled to examine its own witnesses at any time and need not have sought the court's permission to do so.

Thereafter, the defense secured the services of Dr. Richard Nallick; however, the prosecution cancelled Dr. Heger's scheduled examination of the witnesses. The prosecutor explained to the court on September 17, 1984, that the examination had been cancelled due to Dr. Heger's concern for the well-being of the children if the defense used a male as an expert observer. Consequently, the prosecutor requested that the defense be required to use a female observer. The trial court denied the request, after which the prosecutor indicated the examination would take place the following Friday or Monday. The trial judge stated, "Okay, let us know when and then we will arrange it with Mr. Feinberg to set it up."

The prosecutor then requested that the defense observer not be present in the examination room and instead use a two-way mirror for his observations. Defense counsel objected, expressing the view such observation would be ineffectual. The trial court requested that the defense expert come to court and testify whether the two-way mirror mode of observation would or would not be feasible; defense counsel responded he would have to check his schedule. Dr. Nallick never made such an appearance.

On September 19, the trial court ruled the defense expert observer was limited to the use of a two-way mirror, whereupon defense counsel requested two days in which to prepare a petition for a writ. In response, the prosecutor reminded counsel he need not have notified him of the examina-

tion and did so only from an abundance of caution. Further, defense counsel had been told when notice was given that the defense observer must be female. At this juncture, the court noted the defense expert intended to insert the colposcope into the vagina of the victims, which was not Dr. Heger's method. The prosecutor thereupon informed the court the site of the examination—Children's Institute International—was not equipped with a two-way mirror and again requested that the defense use a female expert observer. The court inquired whether defense counsel desired a continuance to obtain a female expert; defense counsel declined the offer. Thereafter, the trial court made the following order: Dr. Nallick could not conduct an examination of the victims and, if a two-way mirror was not available, only a female defense expert could observe the examination directly.

Dr. Heger conducted her examination of the three victims on the morning of September 21, 1984. Later the same day, this court granted defendant a stay pending determination of defendant's petition for a writ. Defense counsel was not notified of the date and time of the examination; Dr. Nallick therefore was not present.

On December 20, 1984, this court granted a peremptory writ (*Mendibles* v. *Superior Court* (1984) 162 Cal.App.3d 1191 [208 Cal.Rptr. 841]), ordering the trial court to conduct an evidentiary hearing to determine whether the ex parte examination was improper and prejudicial to defendant. The trial court was directed to make findings on the following specific questions: "(1) Did the trial court's order require the People to notify petitioner and/or the trial court of the date and time of the examinations to allow petitioner to have a medical observer present? (2) If so, was the People's failure to provide such notification inadvertent, or was it willful and in bad faith? (3) What, if any, prejudice did petitioner suffer by virtue of his failure to receive prior notice of the examinations? (4) If any prejudice was suffered by petitioner, can it be cured?" (At p. 1197.)

In response to the peremptory writ, a hearing was held on February 12, 1985. The trial judge stated he had never intended to require the People to give defendant notice of the examination. Further, assuming such notice should have been given, the People acted in good faith. The latter finding clearly is supported by the evidence.

Defendant had been told a male defense expert was required to observe the examination through a two-way mirror and only a female expert could observe the examination directly; defense counsel had declined the opportunity of a continuance to obtain a female expert, maintaining none was available. In these circumstances, since defense counsel had been informed

of the nonavailability of a two-way mirror at the site of the examination, providing notice of the date and time of the examination would have been, in the prosecutor's view, an exercise in futility.

The trial court held a further hearing on June 3, 1985, to determine the question of prejudice. After hearing testimony from Dr. Heger and affording defendant an opportunity to present testimony from Dr. Nallick, the trial court found no prejudice to defendant from the failure to notify counsel of the date and time of the examination. It is this ruling which defendant now challenges directly, asserting the court's finding cannot be reconciled with the evidence. He argues Dr. Heger could rely on her own observations, both macroscopic and microscopic, while Dr. Nallick was limited to viewing the stereoscopic slides taken with the colposcope. Defendant characterizes Dr. Heger's testimony as stating a proper evaluation of the examinations *could not be made* from the slides alone and repeatedly stressing the importance of her personal observations. This is something of a mischaracterization of Dr. Heger's testimony.

A trial court's findings must be upheld if supported by substantial evidence. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961].) The trial court alone has the power to weigh evidence and draw factual inferences, as well as to assess witness credibility. (*Id.,* at p. 596.) Defendant maintains, since Dr. Heger was the sole witness testifying on the question of prejudice, the trial court was not presented with the necessity of weighing the evidence or assessing Dr. Heger's credibility. This position misconceives the trier of fact's function. Notwithstanding testimony from one witness alone, the trial court nonetheless must weigh the evidence thus presented and give consideration to the apparent credibility of the witness. Hence, that Dr. Heger alone testified does not entitle this court to substitute its judgment on those factors for that of the trier of fact.

Dr. Heger clearly testified she was not aware of any sense of urgency in doing the examinations of the three victims on the morning of September 21, 1984; she was not aware of defendant's writ proceeding and had no present recollection of when, how or why the examinations were set for that date. More importantly, Dr. Heger was adamant in her opinion a proper examination of stereoscopic slides taken during a colposcopic examination would permit an accurate diagnosis. While she expressed a clear preference for making a diagnosis based on the totality of the information available, including a history and her own personal macroscopic and microscopic observations, she herself had reviewed the colposcopic slides of other physicians and made accurate diagnoses based thereon.

She explained her preference thusly: "[Y]ou might not get everything [that you would] when you are there in person looking through a colposcope. It is like a video. Your eyes are always taking in patterns and changes and when you take pictures, it is static and although the pictures are a representation of the changes and certainly represent scarring and the pattern of changes, it is obvious I would rather see a videotape of something than slides. But it doesn't mean that you can't visualize the same things with the slides that you would see with the video."

It should be borne in mind also that the slides taken by the colposcope camera are stereoscopic; when used with a stereoscopic viewer, they give a three-dimensional picture of the slide subject matter—something lacking in a videotape. In fact, Dr. Heger was able to observe factors in her colposcopic examination—factors preserved on the stereoscopic slides—which she could not observe macroscopically, i.e., "some additional vessel changes or neovascularity patterns . . . ." In her opinion, the colposcopic photographs had additional importance: "[T]he photos can document for another physician the fact that the findings are consistent with the views *thereby sparing re-examinations.*" (Italics added.) Dr. Heger did acknowledge there was a higher likelihood of making errors in diagnosis by simply viewing the slides; she explained: "I would probably make more errors in the direction of not seeing everything. In other words, you would make errors in the direction of saying, 'they look more normal.'" Given its content, this portion of her testimony does not support the existence of prejudice to defendant.

Defendant further argues the prejudice is clear from Dr. Heger's own trial testimony. He makes much of one instance during cross-examination when defense counsel was questioning Dr. Heger concerning one small area of one slide. Dr. Heger objected, stating: "I can't make a diagnosis on a very, very small findings [*sic*] in a *projected slide* with no resolution and no detail. . . . If you are going over each crease in the picture, I am going to state I will not answer the question. It is unfair to evaluate." The underscored language is the key to Dr. Heger's objection. Stereoscopic slides, taken in pairs and meant to be observed through a stereoscopic viewer, were being *projected* on a screen in the courtroom. Obviously, Dr. Heger was not able to make her usual observations in these circumstances. However, Dr. Nallick, defendant's expert, had the opportunity to view the slides stereoscopically if he so desired. Hence, the language quoted above does *not* serve to confirm that defendant suffered prejudice.

Defendant also asserts Dr. Heger claimed to see a significant scar on one slide, but acknowledged it was virtually impossible to discern on the slide. Again, this mischaracterizes her testimony. She stated it was difficult to discern on the *projected* slide, *not* on a stereoscopically viewed slide. Finally,

defendant points to Dr. Heger's testimony that *most* of the scarring appeared on the colposcopic slides, arguing it thus is unequivocally clear Dr. Nallick was unable to duplicate Dr. Heger's analytic experience. Nevertheless, there is nothing in either Dr. Heger's hearing testimony or her trial testimony to indicate any scarring of real significance did not appear on the slides. Indeed, when she utilized the slides in her testimony she highlighted the major areas of scarring upon which she relied for her opinions.

In sum, there is nothing in Dr. Heger's testimony which compels the view the trial court could not find her to be a credible witness presenting evidence of substantial weight. Viewed in this light, the trial court's finding defendant suffered no prejudice is supported by substantial evidence and thus must be upheld. (*People* v. *Leyba, supra,* 29 Cal.3d at p. 597.) Moreover, the thoroughness and excellence of the defense cross-examination of Dr. Heger, during which counsel obtained important concessions regarding her findings, the authority with which Dr. Nallick testified and the little credence the jury gave to important findings of Dr. Heger all demonstrate affirmatively defendant in fact suffered no prejudice.

## III

Defendant asserts the trial court erred prejudicially in permitting the improper rebuttal testimony of Mrs. H., including inadmissible hearsay relating to uncharged sexual offenses. We perceive no merit in the assertion.

 Proper rebuttal evidence is restricted to that made necessary by the defendant's case " 'in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start.' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 330 [165 Cal.Rptr. 289, 611 P.2d 883], quoting from *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665].) Defendant's characterization of Mrs. H.'s testimony as consisting of nothing more than facts he " 'would clearly have denied from the start' " (*ibid.*) overstates the matter considerably. Much of Mrs. H.'s testimony rebuts new evidence defendant presented.

Moreover, that some of it rebuts express denials of specific facts does not render the testimony improper. Rebuttal testimony also may be proper when it is offered as impeachment to meet evidence on a point put in dispute, i.e., specific statements of fact to which the defense has testified. (*People* v. *Harrison* (1963) 59 Cal.2d 622, 629 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Gay* (1972) 28 Cal.App.3d 661, 672 [104 Cal.Rptr. 812].)

Defendant testified in great detail to the events of January 18 and 19, 1983; he expressly stated he and Ms. L. were present when Mrs. H. arrived and voluntarily relinquished all three girls for the night. Mrs. H.'s testimony unequivocally rebuts those statements. Defendant further testified no one told him Mary was bleeding or the girls would be taken to the hospital; Mrs. H.'s testimony also clearly rebuts those statements. In addition, defendant directly attributed certain words to Ms. L., and Mrs. H.'s testimony unequivocally rebuts that portion of his testimony. Defendant also suggested a motive for fabrication, testifying he was in the process of leaving Ms. L. and she had told him she would make him pay; indeed, he already had begun removing his belongings from the apartment. Mrs. H.'s testimony inferentially rebuts that portion of defendant's testimony also.

Defendant had directly attacked the credibility of all three girls—especially Pauline. The statements Pauline made to Mrs. H. in November and December 1982, after Mrs. H. observed some extreme bruises on Pauline, serve as prior consistent statements rehabilitating her credibility. They were made before the time defendant asserts a motive to fabricate had arisen (Evid. Code, § 791, subd. (b)), and hence qualify for admission (Evid. Code, § 1236; *People v. Coleman* (1969) 71 Cal.2d 1159, 1166 [80 Cal.Rptr. 920, 459 P.2d 248]). Those statements and Mrs. H.'s observations also serve to rebut defendant's direct statement he never hit the girls with anything other than his hand and never hit them other than to spank them.

Finally, defendant expressly denied ever being home when the girls took showers—except on one occasion, stated he never was home alone with the girls and cast doubt on whether the girls ever had been home sick during the day. Mrs. H.'s narration of Pauline's and Mary's statements to her clearly serves to rebut those portions of defendant's testimony.

Defendant also characterizes the crucial portions of Mrs. H.'s testimony as inadmissible hearsay. Hearsay is "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Such evidence is inadmissible unless it falls within recognized exceptions. (Evid. Code, § 1200, subd. (b).)

The first hearsay statement appearing in the testimony of Mrs. H. is her relation of Pauline's statement that defendant made her take showers with him and wash him. The People assert the statement is admissible as a prior consistent statement. To be admissible, a prior consistent statement which is offered to rebut an inference the declarant had a motive to fabricate must have been made before the alleged improper motive arose. (Evid.

Code, §§ 1236, 791, subd. (b); *People* v. *Coleman, supra,* , 71 Cal.2d at p. 1166.)

Defendant alleged Ms. L., Pauline's mother, developed a motive to fabricate several days before the statement was made on January 18, 1983. While it is uncertain Pauline therefore necessarily had a motive to fabricate on that date, it cannot be said with assurance the statement meets the requirements of Evidence Code section 791, subdivision (b). Accordingly, defendant is correct in characterizing it as inadmissible hearsay. However, it is unequivocally clear defendant suffered no prejudice from the admission of the statement. Defendant was charged with offenses against each girl relating to only one shower incident, alleged to have occurred at the Evergreen Motel; he was acquitted of those charges.

■ Defendant also challenges Mrs. H.'s relation of Mary's statement she was presently bleeding and had bled before, inferentially because defendant had touched her, as well as her statement she was afraid to wear dresses because defendant touched girls who wore dresses. These statements fall into categories other than prior consistent statements.

Mary's statement regarding her bleeding and defendant touching her was made after Mrs. H. sent the two girls to bathe. When they returned, she observed them whispering and asked what they were talking about. Without further prompting or any focus on the possibility of sexual abuse, Mary made her response. She related a present condition and her view of its cause. Such a statement by the victim of a sexual offense is admissible as a fresh complaint. (*People* v. *Burton* (1961) 55 Cal.2d 328, 351 [11 Cal.Rptr. 65, 359 P.2d 433]; *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1129 [200 Cal.Rptr. 789].)

The statement relating Mary's fear of wearing dresses and the reason for her fear was admissible as a declaration of her "then existing state of mind." (Evid. Code, § 1250.) Since defendant had alleged the existence of a motive to fabricate and had attacked the victims' credibility vehemently, Mary's state of mind at the time she made her complaint to Mrs. H. was relevant. In sum, there was no error in admitting Mary's hearsay statements.

■ Defendant next attacks Mrs. H.'s narration of the statements of Ms. L. When defendant returned to the apartment on January 19 and realized Ms. L. was in the process of packing, he asked her what was going on. According to Mrs. H., Ms. L. replied, "I'm going to get . . . out of here." As the two women and the girls walked away from the apartment building, Ms. L. also said to defendant, "Mary said that she was bleeding. I am going to take her to the hospital and see what is going on."

These statements need not have been offered for the truth of their contents and, hence, need not be hearsay. (Evid. Code, § 1200, subd. (a).) The statements justify inferences concerning the belief, motive and/or intent of the declarant, Ms. L.; therefore, they are admissible as circumstantial evidence of a relevant state of mind—in this case, to rebut the implication Ms. L. acted from an improper motive to fabricate and to rebut defendant's testimony she knew he was in the process of moving out of the apartment. (*Skelly* v. *Richman* (1970) 10 Cal.App.3d 844, 858 [89 Cal.Rptr. 556]; accord, *People* v. *Tahl* (1967) 65 Cal.2d 719, 739 [56 Cal.Rptr. 318, 423 P.2d 246].) Hence, there was no error in the admission of these statements. The testimony of Mrs. H. also contains statements defendant himself made. These, of course, are admissible as party admissions. (Evid. Code, § 1220.)

Finally, defendant claims the statements Pauline and Mary made to Mrs. H. and to which she testified constitute improper evidence of uncharged offenses. To be sure, the parties had agreed at the outset of the trial not to admit evidence of uncharged offenses—*unless* the defense opened the door to such evidence. However, to characterize the challenged testimony as violating that agreement defies logic.

Mary's complaint was so vague it cannot be viewed as referring to any particular incident on any particular date or to any particular number of incidents. Indeed, her expression of fear of wearing dresses could be a relation only of a causal connection she had made in her own mind and not of any particular incident. Any inference Mary was in fact referring to additional uncharged offenses is not reasonably drawn, but is necessarily speculative. Pauline did refer to "showers" in the plural, while defendant was charged with offenses relating to only one shower incident. Insofar as this amorphous reference may be viewed as evidence of uncharged offenses, it is clear defendant was not harmed by its admission. He was acquitted of all shower-related offenses.

IV

Defendant avers the trial court erred prejudicially in giving the People's special instruction on the "force, violence, duress, menace, or threat of immediate bodily injury" element of the charged offenses. Although we agree the trial court erred, we discern no prejudice to defendant.

The special instruction in question reads in pertinent part: "The prosecution need not prove resistance, but the prosecution must show that the act was undertaken against the will of the victim. This may be met by proof that such force was used as would reasonably demonstrate that the act was undertaken against the will of the victim considering all circumstances,

including the ages and size[s] of the defendant and the victim. . . . Psychological coercion, without physical touching, may constitute an application of force or may fall within the definition of duress or menace as defined above."

Defendant construes this last sentence as informing the jury the force, violence, duress or menace element of the offenses could be established by evidence of psychological coercion alone. The People dispute this construction, viewing the challenged sentence as simply informing the jury psychological coercion may or may not be an application of force and may or may not fall within the definitions of duress and menace. The latter view is fatuous. It is clear a juror, relying on the challenged sentence, would conclude he or she could find the existence of force from the presence of psychological coercion without any touching; this is indeed erroneous instruction.

*People* v. *Cicero* (1984) 157 Cal.App.3d 465 [204 Cal.Rptr. 582] considers the definition of force within the meaning of Penal Code section 288, subdivision (b), the provision defendant was charged with violating. Initially, the court notes it need not decide in the case before it whether "force" might result from the application of psychological coercion without touching or "duress" or "menace" alone should be viewed as emanating from that source. (At p. 474, fn. 8.) The court then concludes " 'force' should be defined as a method of obtaining a child's participation in a lewd act in violation of a child's will and not exclusively as a means of causing physical harm to the child." (*Id.*, at p. 476.) After noting further that " 'duress, menace, or threat of great bodily harm' . . . are [words] ordinarily used to demonstrate that someone has used some form of psychological coercion to get someone else to do something they don't want to do, i.e., something against their will" (*id.*, at p. 477), *Cicero* holds the requirement of "force" may be met by circumstantial evidence such force was used as would reasonably demonstrate the act was undertaken against the will of the victim, considering all circumstances, including the sizes and ages of the defendant and the victim. (*Id.*, at pp. 481-482.)

While utilizing the *Cicero* holding as a working definition of "force," the People evidently seized upon the language of footnote 8 to structure the portion of the instruction now challenged. Regrettably, the language the People chose does not convey the same meaning expressed in footnote 8 and, if it did, would not aid the jury. Nothing but confusion is likely to result from instructing a jury that a legal point or definition is open to question.

It is clear "force" cannot be applied to a victim by the use of psychological coercion without any touching of the victim; to define the term to

encompass such a concept would be to vitiate any difference between the concepts of force, duress and menace. (Accord, *People* v. *Pitmon* (1985) 170 Cal.App.3d 38, 50, fn. 9 [216 Cal.Rptr. 221].) Hence, it was error to include in an instruction given the jury language which suggests otherwise.

It does not follow, however, that defendant therefore is entitled to a reversal of his conviction. Instructional error of this sort does not result in reversal unless there is a reasonable probability the trial would have yielded a more favorable result without the misinstruction. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251].) In the instant matter, the jury was instructed correctly on the definition of actual physical force, i.e., force involving a touching of the victim.

Defendant was convicted of four offenses, two involving Elizabeth and two involving Mary. In each instance, the victim stated she tried to get away from defendant, but he pulled her back. In addition, Elizabeth testified defendant pulled her head forward then forced her to perform an act of oral copulation; Mary gave similar testimony. This is unequivocal evidence of the application of physical force as defined by *Cicero*. (*People* v. *Pitmon, supra,* 170 Cal.App.3d at p. 48.) Given this evidence of physical force, there is no reasonable probability defendant would have obtained a more favorable result had there been no misinstruction. (*People* v. *Burgener, supra,* 41 Cal.3d at p. 538.)[1]

V

Finally, defendant contends the prosecutor committed prejudicial misconduct by loudly referring in a bench conference to excluded uncharged offenses of which Mary purportedly was the victim and in arguing by innuendo the court had kept other similar evidence of guilt from the jury. The contention lacks merit.

Throughout defense counsel's cross-examination of Pauline and Mary, he repeatedly asked vague and open-ended questions which confused the

---

[1] Defendant also asserts the special instruction given on the elements of force, violence, duress, menace or threat of great bodily harm improperly defines "duress." He relies on *People* v. *Pitmon, supra,* 170 Cal.App.3d at page 50, where the court defines "duress" as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (Fn. omitted.) In contrast, the challenged instruction defines "duress" as "the unlawful confinement of a person, her property, or confinement which is unjustly harrassing or oppressive." The People in turn assert the *Pitmon* definition of duress is wrong. This court need not decide the issue; the definition given is more restrictive than that set forth in *Pitmon,* so defendant could not have suffered any conceivable harm from any misdefinition.

witnesses and threatened to reveal to the jury instances of sexual abuse or lewd conduct other than those with which defendant was charged. Indeed, in defense counsel's cross-examination of Pauline, such evidence was placed before the jury in response to his questions. This incident resulted in a bench conference in which the trial court told defense counsel his questions were "vague and open-ended . . . and that [is] the problem."

The jury had learned defendant had shown Pauline "adult" magazines and then touched her while the "family unit" was residing at the Vagabond Motel; this was an incident unrelated to the charged offense alleged to have occurred at the same location. In addition, defense counsel had elicited testimony unrelated to any charged offense by asking Pauline when she first saw a penis other than in a magazine. After extensive discussion, the court indicated, "I don't want to get involved in additional facts. I want to instruct the jury that he is only charged with these counts. We are not interested in any other sexual conduct and strike the testimony concerning the questions when [Pauline] first saw a penis. . . . That is not complete. But that is the idea I want to convey to the jury because we have to undo what has been done by your questioning."

Subsequently, while defense counsel was cross-examining Mary, it became clear he was again utilizing vague, open-ended questions which were confusing her as to the times and events defense counsel had in mind. It was clear to the court and to the prosecutor, though it may only have been confusing to the jury, that Mary was giving responses which related to events other than those to which she had testified on direct examination.

The bench conference defendant now claims resulted in prosecutorial misconduct occurred after defense counsel again asked such a question and it was clear to the prosecutor he was likely to elicit an "uncharged offense" response. The prosecutor asked to approach the bench in an effort to foreclose the development of a problem akin to that which had arisen while Pauline was testifying. After approaching the bench, the prosecutor stated, "Your Honor, this child was abused on an ongoing basis. There were dozens of times when she was forced to orally copulate [defendant] and have intercourse. Mr. Feinberg [defense counsel] is about to open the door to these other activities and I am trying to stop it before it happens."

An extensive three-way discussion followed, in which the court attempted to resolve the problem. Defense counsel acknowledged he wanted no "other offense" evidence to come before the jury and stated, "I am afraid even our conversation can be overheard." The court attempted to finally remedy the situation by dismissing the jury and talking to Mary at length to ensure she understood she was to refer only to the three incidents concern-

ing her with which defendant was charged when she answered questions. Shortly thereafter, the court called a recess.

When trial resumed, defense counsel indicated to the court he had information some of the jurors might indeed have overheard at least portions of the bench conference. The court called the jury into the courtroom and inquired whether any of them had overheard remarks made during the last bench conference immediately preceding the recess. Five jurors indicated they had. The court thereupon excluded the jury and questioned each of the five jurors privately as to what was overheard.

Juror Schwesky stated, "I don't remember [what exactly I heard]. I just heard a phrase where I *think* the district attorney was talking about a lot of incidents." (Italics added.) Juror Miller stated he could see the district attorney's lips and the prosecutor seemed to say " 'your honor, the child was subjected to considerable child abuse' or repeated child abuse. Something of that nature and then . . . that would . . . lead to confusion . . . . I made no note of that. I thought it was something I should disregard." Juror Batavick stated he heard " 'well this happened—there were so many instances' or 'it happened so many times' meaning the oral copulation and the other acts. That you have her try to remember just this one instance was confusing to her. It was a reference that it happened more than one time." Juror Yellin heard the district attorney say "that this witness had been abused many times. Something to that effect." Finally, Juror Lichtman heard "that there were other things that had happened, and that she couldn't remember. She might not be able to remember one from the other. So many things had happened."

Following these revelations, defense counsel moved for a mistrial. The court heard extensive argument on the motion after reading both moving and opposition papers, then took the matter under advisement. Ultimately, the court decided to question the jurors further in the course of giving them a detailed admonition in order to determine whether there had been any irrevocable prejudice to defendant.

The court spoke to each juror privately, stating the following: "Yesterday you overheard remarks made at the bench conference and as I previously told you and the other jurors, of course, bench conferences involve legal issues not for the jury's determination and cannot be used as evidence in this case. [¶] Do you understand that? . . . Now, the remarks that you overheard taken out of context of other facts unknown to you are meaningless and cannot be used as evidence in this trial. [¶] You understand that as well? . . . In this case, we are not interested in other individuals not referred to by the evidence admitted in this case nor are we interested in other

possible defendants. Nor are we interested in other cases or possible cases. Nor are we interested in child abuse; that is, beatings or possible sexual conduct not involved in this case. [¶] Do you understand that? . . . Only testimony admitted into evidence can be considered by you in determining whether a defendant is guilty or not guilty[.] [¶] Do you understand that?

"Will you follow the court's order to you as I just gave you? . . . Do you believe you can follow the law as I give it to you at the end of the trial? . . . Are you in any way prejudiced against either side in this matter? . . . Will you keep what you overheard to yourself and not let it enter into deliberations?" Each juror in turn indicated he or she was not in any way prejudiced against either side in the matter being tried and answered the remainder of the court's questions affirmatively. Thereafter, the trial court denied defendant's motion for mistrial.

Defendant asserts this entire incident emanated from prosecutorial misconduct, in that the prosecutor loudly made his comments about "repeated sexual abuse" for the purpose of bringing before the jury in this manner evidence he had not otherwise succeeded in introducing. The assertion is utterly specious. First, as noted above, it was defense counsel—*not* the prosecutor—who repeatedly opened the door to the admission of evidence of uncharged offenses. More than once, the prosecutor attempted to put an *end* to the practice. In fact, the bench conference in question was called specifically for that purpose. Second, there is nothing in the record to suggest the prosecutor made his remarks in an abnormally loud voice; the trial court did not caution him to lower his voice and defense counsel did not request that he do so. There is no basis for inferring he spoke any more loudly than any other party to the conference or, if he did so, that he did so in bad faith rather than inadvertently.

" 'Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.]' " (*People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776].) Inasmuch as there is no indication the prosecutor approached the bench for the purpose of disclosing prejudicial information to the jury or deliberately spoke in abnormally loud tones, his acts cannot reasonably be characterized as misconduct. There remains the question, however, whether defendant nevertheless was entitled to a mistrial.

It is clear the dismissal of felony charges without a trial on the merits is an extreme sanction against the People. (*People* v. *Mills* (1978) 87 Cal.App.3d 302, 308 [151 Cal.Rptr. 71].) Accordingly, where the granting of a mistrial will lead to that result, it should be granted only if the court is apprised of prejudice which it judges is incurable by admonition or instruc-

tion. (*People* v. *Haskett, supra,* 30 Cal.3d at p. 854.) That question is, by nature, speculative; hence, the trial court is vested with considerable discretion in ruling on a motion for mistrial. (*Ibid.*)

 In the instant matter, the jury was not exposed to the damaging information purposely or in the form of evidence and the affected jurors were admonished promptly and thoroughly. Moreover, only five jurors were exposed to the revelations regarding uncharged offenses allegedly committed against Mary—*not* the entire jury. Nonetheless, defendant argues he necessarily was prejudiced incurably. He notes the special regard which a jury has for a prosecutor, making such revelations "dynamite" which circumvents the rules of evidence. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396].) *Bolton* makes this observation in the context of a prosecutor's closing argument to the jury. In that setting, the implication there is other damning evidence against the defendant is indeed "dynamite" which is highly prejudicial to the defendant. As noted *ante,* however, the instant remarks were made at a bench conference; the jurors were well aware the discussion was not intended for their ears. In addition, it is not the entire jury which was affected, but five individual jurors.

Defendant also relies on the principle that " 'some degree of prejudice is necessarily created by permitting the jury to hear *evidence* of [other] crimes.' [Citations.]" (*People* v. *Smallwood* (1986) 42 Cal.3d 415, 429 [228 Cal.Rptr. 913, 722 P.2d 197], italics added.) Again, it is clear the instant jury was not exposed to *evidence.* He further relies heavily on *People* v. *Luparello* (1986) 187 Cal.App.3d 410 [231 Cal.Rptr. 832]. In *Luparello,* the prosecutor engaged in extensive questioning which elicited evidence of gang membership. By innuendo, this evidence suggested a connection with violent acts, including homicide, and a connection to the case being tried which induced the threatening of a material witness. (At p. 426.) The court does state: "While the court's sustaining of defense objections and striking of testimony suggested it did not condone such conduct, the flagrancy of the prosecutor's misconduct makes it highly unlikely that even a conscientious jury could completely ignore what it had heard. [Citations.]" (*Ibid.*)

In this instance, there was no flagrant, extensive exposure to improper evidence and the jurors were not universally affected. In any event, *Luparello* ultimately concludes the other properly admitted evidence of the defendant's violence minimized the effect of the prosecutor's misconduct, thereby rendering the error harmless. (*Id.,* at pp. 426-427.) Here also there is ample other evidence, properly admitted, of defendant's sexual abuse of the victims. Hence, contrary to defendant's view, *Luparello* does not support the conclusion he suffered irreparable prejudice.

Moreover, the prosecution case was not, as defendant would characterize it, exceedingly close. Defendant was acquitted of the three "shower incident" offenses not, as he maintains, because of the general weakness of the prosecution's case but more probably because Elizabeth testified on cross-examination no one touched defendant during that incident, in that she and her sisters instead ran from the shower. In all probability, he also was acquitted of count II, based on alleged penile-vaginal contact or penetration perpetrated on Pauline, because Pauline gave conflicting accounts in one of which she stated she was clad in pajamas and defendant was fully clothed and because Elizabeth provided no corroborative testimony. Whatever the jury thought of Pauline's credibility, however, Mary and Elizabeth were unshakeable in their testimony regarding the other charged offenses.

That the jury was unable to reach a verdict on count IX, based on alleged penile-vaginal contact or penetration perpetrated on Elizabeth, does not suggest otherwise. There was conflicting expert medical testimony on whether there were physical signs of such contact or penetration. It is probable some jurors entertained reasonable doubts based on the conflict in this evidence. Indeed, that defendant was acquitted of *any* of the offenses suggests the lack of prejudice and the jury's clear ability to consider each count on the evidence presented and nothing else.

The court's admonition to the affected jurors was carefully crafted, detailed and wide-ranging. Each was examined at great length to ascertain his or her clear understanding of the admonition, that he or she was *not* prejudiced against either side and that he or she would maintain confidentiality and avoid infecting the deliberations with the revelations overheard. Given the limited number of jurors affected and the care with which the court conducted its examination and gave its admonition, there is no basis for concluding the court clearly abused its discretion in denying defendant's motion for mistrial.

 Defendant also claims prosecutorial misconduct in the course of the prosecutor's rebuttal argument, asserting he informed the jury by innuendo that the court had kept other evidence of defendant's guilt from the jury. During defense counsel's closing argument he hammered home repeatedly his view that since the victims had lied once regarding the conduct of their uncle, Hector Lopez, they lied throughout the trial. He went beyond that legitimate line of argument to imply the prosecutor had influenced the victims' testimony, telling them what to say. In this vein, he strongly suggested the prosecutor continued to coach Pauline during defense counsel's cross-examination, alluding to one instance in which Pauline had a private conference with the prosecutor while she was being cross-examined.

In response, the prosecutor attempted to explain events as relating to something other than improper coaching of any witness. He stated, "You see we have to fit the times that the children can identify. The judge has instructed you and will instruct you . . . that the only times that are relevant, the only times that we can bring in to evidence and the only thing that I can discuss are those things that relate to the charged information. [¶] [Defense counsel] says 'well Pauline . . . called [the prosecutor] over to ask a question' and therefore I guess there is some implication from that. We see that it isn't the evidence. [*Sic.*] The problem is that we have to be very careful about whatever evidence comes from the witness stand and that the court had made some rulings that keep things out."

 It is settled that "even otherwise prejudicial prosecutorial argument, when made within proper limits in rebuttal to arguments of defense counsel, does not constitute misconduct." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843]; *People* v. *Hill* (1967) 66 Cal.2d 536, 560 [58 Cal.Rptr. 340, 426 P.2d 908].) Given the highly inflammatory implications of defense counsel's argument, unequivocally impugning the integrity of the prosecution, the above rebuttal remarks were "fairly responsive to argument of defense counsel and [were] based on the record." (*Ibid.*) In these circumstances, the prosecutor "cannot be charged with misconduct if his comments only spill over somewhat into a forbidden area; the departure from propriety must be a substantial one." (*Id.,* at p. 561.)

The key consideration in assessing a possible "departure from propriety" is whether there is any undue advantage to the People or disadvantage to the defendant. This is determined by inquiring whether the response was intended or formed to invite the jury to draw adverse inferences, was unduly emphasized and related to central or peripheral areas of determinant factors concerning the defendant's guilt or innocence. (*Ibid.*) Here, there was nothing in the argument which invited the jury to draw adverse inferences; to the contrary, it was structured solely to *counter* exceedingly adverse inferences which the *defense* had invited the jury to draw. It was not aimed at defendant, was not unduly emphasized and related only to peripheral areas concerning the defendant's guilt or innocence.

Moreover, in response to defense counsel's objection, the court promptly admonished the jury as follows: "[Y]ou are limited to the record and that is what we are going to decide the case on." In these circumstances, it is clear the prosecutor's remarks gave no undue advantage to the People or disadvantage to defendant; hence, even if there was error, it must be viewed as harmless. (*Ibid.*; see also *People* v. *Haskett, supra,* 30 Cal.3d at p. 866.)

The judgment is affirmed.

Lucas, J., and Devich, J., concurred.

A petition for a rehearing was denied April 20, 1988, and appellant's petition for review by the Supreme Court was denied July 21, 1988.